1
2
3
4
5

FLETCHER & LEE
Elizabeth Fletcher, Esq.
Nevada Bar No. 10082
448 Ridge Street
Reno, Nevada 89501
Telephone: 775.324.1011
Email: efletcher@fletcherlawgroup.com

6
7
8
9
10
11

HARRIS LAW PRACTICE LLC
Stephen R. Harris, Es
Nevada Bar No. 1463
Norma Guariglia, Esq.
Nevada Bar No. 16244
850 E. Patriot Blvd., Suite F
Reno, Nevada 89511
Telephone:   775.786.7600
Email: steve@harrislawreno.com
Email: norma@harrislawreno.com

12

*Attorneys for Debtor*

13

**UNITED STATES BANKRUPTCY COURT**

14

**DISTRICT OF NEVADA**

15
16
17
18
19
20

| | |
|---|---|
| In re: | Case No. 24-50152-hlb |
| RENO CITY CENTER OWNER, LLC | Chapter 11 |
| Debtor. | Hearing Date:  December 17, 2024<br>Hearing Time: 10:00 a.m.<br>Hearing Location: Remote; telephonic |

21

**SECOND AMENDED PLAN OF REORGANIZATION**

22

Dated:          November 1, 2024

23

Filed by:      Reno City Center Owner, LLC, a Delaware limited liability company

24

          Reno City Center Owner, LLC ("Owner" or "Debtor"), Debtor and Debtor-in-Possession

25

in the above-captioned Chapter 11 case, through its undersigned counsel, pursuant to 11 U.S.C.

26

§1121(a), hereby proposes the following **SECOND AMENDED PLAN OF**

27

**REORGANIZATION** and requests confirmation pursuant to the provisions of 11 U.S.C. §§

28

1129(a) and/or (b).

# I.    **INTRODUCTION**

This SECOND AMENDED PLAN OF REORGANIZATION ("Plan") is proposed by the Debtor for the resolution of the Debtor's outstanding creditor obligations.  The Plan is offered pursuant to Chapter 11 of Title 11 of the United States Code and should be read in conjunction with the [CONDITIONALLY APPROVED] SECOND AMENDED DISCLOSURE STATEMENT ("Disclosure Statement") concerning this Debtor that will be approved by the United States Bankruptcy Court.

Along with this Plan, creditors will receive a Disclosure Statement which has been conditionally approved by the United States Bankruptcy Court.  The Court has determined that the Disclosure Statement is adequate, with amendments, to enable creditors to make an informed judgment on whether to accept or reject the Plan.  The Disclosure Statement fully sets forth the Debtor's background information, an analysis of the Debtor's financial position, and a summary of this Plan.  The Debtor has not authorized any statement or representation, such as the value of its property or the amount of its creditors' claims, which is not contained in the court-approved Disclosure Statement.

Information as to the procedures relating to approval, confirmation, and consummation of the Plan may be obtained from counsel for the Debtor, upon written request.

**THE PROVISIONS OF THE CONFIRMED PLAN WILL LEGALLY BIND THE DEBTOR AND ITS CREDITORS, REGARDLESS OF WHETHER THEY HAVE FILED CLAIMS OR HAVE ACCEPTED THE PLAN.**  Creditors should thoroughly review both the Plan and the Disclosure Statement before determining whether to accept or reject the proposed Plan.

# II.    **DEFINITIONS**

For purposes of this Plan, all capitalized terms and otherwise defined terms shall have the meanings assigned to them in this Article II.  Whenever the context requires, such terms shall include the plural number as well as the singular and the female and/or masculine gender as well as the neuter.

1.    "ADMINISTRATIVE CLAIM."  This term shall refer to and mean every claim

2

that is entitled to allowance under Section 503(b) of the Bankruptcy Code or otherwise entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, arising prior to the Effective Date, including, without limitation: **(a)** any actual, necessary expense preserving the Estate, including, without limitation, expenses necessary or appropriate to carry out, facilitate, or effectuate this Plan; **(b)** any amount required to be paid under Section 365(b) of the Bankruptcy Code in connection with the curing of defaults under executory contracts or unexpired leases; and **(c)** all allowances, including professional fees and costs, approved by the Bankruptcy Court for the Debtor's professionals and professionals employed by the Committee.

2.    "ALLOWED ADMINISTRATIVE CLAIM" shall mean an Administrative Claim: **(a)** as to which no objection has been filed or, if an objection has been filed, such objection has been resolved by the allowance of such Administrative Claim by a Final Order; **(b)** which requires payment in the ordinary course of business of the Debtor and as to which there is no order of the Bankruptcy Court in effect which prohibits any such payment; or **(c)** which requires payment pursuant to a Final Order.

3.    "ALLOWED CLAIM" or "ALLOWED INTEREST" shall mean claims against or interest in the Debtor to the extent that –

    a.   Proof of claim or interest was –

        i.   Timely filed;

        ii.  Deemed filed, if such claim or interest appears in the schedules filed herein, unless such claim or interest is scheduled as disputed, contingent, or unliquidated; or

        iii. Late filed –

            1.   With leave of the Bankruptcy Court; or

            2.   Without objection by the Debtor within a time fixed by the Bankruptcy Court; and

    b.

        i.   The Debtor does not file an objection within a time fixed by the Bankruptcy Court; or

        ii.  The claim or interest is allowed by a Final Order; or

3

iii.   The claim or interest is allowed under this Plan.

4.      "ALLOWED PRIORITY CLAIM" shall mean a Priority Claim which is an Allowed Claim.

5.      "ALLOWED SECURED CLAIM" shall mean an Allowed Claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value (determined in accordance with Section 506(a) of the Bankruptcy Code) of the interest of the holder of such Allowed Claim in the Debtor's interest in such property or to the extent of the amount subject to such set-off, as the case may be.

6.      "ALLOWED SUBORDINATED CLAIM" shall mean an Allowed Claim arising from any Indebtedness evidenced by or related to the claim of a Subordinated Creditor.

7.      "BALLOT" shall mean the Ballot(s) for accepting or rejecting this Plan in a form(s) approved by the Bankruptcy Court.

8.      "BANKRUPTCY CODE" (or the "CODE") as used herein refers to Title I of Public Law No. 95-598, as codified in Title 11 of the United States Code, and all amendments thereto, and typically abbreviated as "U.S.C."

9.      "BANKRUPTCY COURT" (or "COURT") shall mean the United States Bankruptcy Court for the District of Nevada (Reno, Nevada), in which the Debtor's Chapter 11 case is pending, such other court as has jurisdiction in this Chapter 11 case, and any court having competent jurisdiction to hear appeals or certiorari proceedings therefrom.

10.      "BANKRUPTCY RULES" shall mean the Federal Rules of Bankruptcy Procedure, as promulgated under 28 U.S.C. § 2075, including any amendments thereto, which are in effect before and as of the Confirmation Date, and thereafter during the Reorganization Case, to the extent that they are consistent with vested rights under this Plan and the Confirmation Order.

11.      "BUSINESS DAY" shall mean any day except Saturday, Sunday, or a day on which commercial banks in Washoe County, Nevada, are authorized or required by law to close.

12.      "CLAIM" shall mean: **(a)** any right to payment form the Debtor or its Estate, including an Administrative Claim, whether or not such right is reduced to judgment, or is

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; and **(b)** any right to an equitable remedy for breach of performance of such breach gives rise to a right of payment from the Debtor or its Estate, including an Administrative Claim, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, secured, or unsecured.

13.      "CLAIMANT" shall mean the holder of an Allowed Claim or an Allowed Administrative Claim.

14.      "CLASS" shall mean any class into which Allowed Claims or Allowed Interests are classified pursuant to Article IV.

15.      "CONFIRMATION" shall mean the entry of the Confirmation Order by the United State Bankruptcy Court.

16.      "CONFIRMATION DATE" shall mean the date on which the Confirmation Order is entered on the Bankruptcy Court's docket.

17.      "CONFIRMATION ORDER" shall mean the Order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code and approving the transactions contemplated herein, which shall be in form and substance acceptable to the proponents.

18.      "CREDITOR" shall mean any individual or entity holding a claim against the Debtor, which claim arose before the order for relief concerning the Debtor, including any claim that may arise under 11 U.S.C. §§ 502(f), 502(g), 502(h), and 502(i).

19.      "DEBTOR" shall mean RENO CITY CENTER OWNER, LLC, Debtor and Debtor in Possession herein.

20.      "DEBTOR'S ASSETS" shall mean all assets and property of every kind, nature and description of which the Debtor or its Estate have any right, title or interest, including but not limited to: real property, personal property, including but not limited to bank deposits, instruments, credit of instruments, certificates of deposit and drafts; all executory contracts which are not and have not been rejected; all choses in action; and all claims, demands, causes of action, damages and obligations of any nature whatsoever, known or unknown in law or in equity, including,

without limitation, claims or causes of action arising under the Bankruptcy Code (including, without limitation, Sections 362, 510, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code), or under any Nevada statute or regulation.

21.     "DEBTOR'S PROFESSIONALS" shall mean the law firm of FLETCHER & LEE, LTD. and the law firm of HARRIS LAW PRACTICE, LLC, as Debtor's general bankruptcy counsel; and all other professionals retained and employed by the Debtor.

22.     "DISCLOSURE STATEMENT" means the written [PROPOSED] AMENDED DISCLOSURE STATEMENT, as may be amended, with respect to this Plan which is approved by the Bankruptcy Court under Section 1125 of the Bankruptcy Code.

23.     "DISPUTED CLAIM" shall mean every claim that is not an Allowed Claim or an Allowed Administrative Claim or to which the Debtor or the Committee or Party-in-Interest files an objection before the deadline for objection set forth in this Plan or an operative order of the Bankruptcy Court.

24.     "EFFECTIVE DATE of the PLAN and NOTICE of EFFECTIVE DATE" shall mean the earlier of December 31, 2024, if the lender requires an effective date prior to the end of 2024, or sixty (60) calendar days after the following have occurred (so long as they remain in effect): **(a)** this Plan has been confirmed pursuant to the Confirmation Order and the Confirmation Order remains in full force and effect without material modification thereof; **(b)** there is not in effect any stay, injunction or restraining order or any other order of any kind which has been issued by a Court of competent jurisdiction or other governmental entity staying, restricting or prohibiting the effectuation of this Plan; and **(c)** there is not in effect any statute, rule, regulation, or order enacted, promulgated or entered which is applicable to the effectuation of this Plan of which results in the consequences referred to in subsection (b) immediately above.  Within two business days of the Effective Date, the Reorganized Debtor or any other authorized parties who have been charged with administering the confirmed plan shall file a Notice of Occurrence of the Effective Date with the Bankruptcy Court indicating that the conditions precedent in this section have occurred, identifying the Effective Date, and indicating that it has occurred.

25.     "EQUITY HOLDINGS" shall mean the Debtor's equity member(s)' interests

6

retained in the Plan, after payment of all allowed creditors' claims.

26.     "ESTATE" shall mean the Estate created in the Reorganization Case pursuant to Section 541 of the Bankruptcy Code.

27.     "EXPIRATION DATE" shall mean the last date determined by the Bankruptcy Court for the casting of Ballots, which date shall be acceptable to the proponents.

28.     "FINAL ORDER" shall mean a final order, judgment or other decree of the Bankruptcy Court or other Court of competent jurisdiction which has not been vacated, reversed, stayed, modified or amended **(a)** as to which **(i)** the time to appeal or seek review or rehearing has expired and as to which no appeal, petition for certiorari, request for review or rehearing is pending, or **(ii)** if appeal, review, rehearing or certiorari of the order has been sought, the order has been affirmed or the request for review, rehearing or certiorari has been denied, the time to seek a further appeal, review, rehearing or certiorari has expired, and **(b)** as a result of which such orders shall become final and not appealable in accordance with applicable law.

29.     "LIEN" shall mean a charge or encumbrance against or interest in property of the Debtor or its Estate, including Debtor's Property, to secure the payment of a debt or performance of an obligation, and includes any right of setoff under Section 553 of the Bankruptcy Code.

30.     "PERSON" includes individual, partnership, corporation, association, joint stock company, joint venture, estate, trust, unincorporated organization, any governmental unit, or political subdivision thereof, or other entity, and all of the respective heirs, personal representatives, successors, and assigns.

31.     "PETITION DATE" shall mean February 16, 2024.

32.     "PLAN" means the PLAN OF REORGANIZATION, in the form filed by the proponents and any amendments or modifications thereof or supplements thereto filed by the proponents and permitted by Article X hereof or the Bankruptcy Court.

33.     "PRIORITY CLAIM" shall mean a claim entitled to priority under Section 507(a)(2)-(8) of the Bankruptcy Code.

34.     "PROPONENT" shall mean the Debtor as the proponent of this Plan.

35.     "*PRO RATA* SHARE" shall mean the proportion that an Allowed Claim in a

particular class bears to the aggregate amount of all Allowed Claims in such class.

36.    "RECORD DATE" shall mean, for purposes of voting, the date of entry by the Bankruptcy Court of the Order Approving the Disclosure Statement and, for purposes of distribution, the Confirmation Date.

37.    "REORGANIZATION CASE" shall mean the Debtor's case under Chapter 11 of the Bankruptcy Code, which is currently pending before the Bankruptcy Court as Case No. 24-50152-hlb.

38.    "REORGANIZED DEBTOR" shall mean RENO CITY CENTER OWNER, LLC, a Delaware limited liability company, on and after the Effective Date of the Plan.

39.    "SECURED CLAIM" shall mean any claim secured by a lien which is valid, perfected, enforceable, and not avoidable.  If the value of the creditors' interest and the Estate's interest in the property securing a claim is not sufficient to satisfy such claim, then in accordance with Section 506 of the Bankruptcy Code and subject to Section 1111(b) of the Bankruptcy Code, such claim shall be deemed to be an unsecured claim under this Plan to the extent of any insufficiency in the value of the creditors' interest.

40.    "UNITED STATES TRUSTEE" OR "US TRUSTEE' or "UST" or "OUST" shall mean Tracy Hope Davis, the United States Trustee for Region 17, or any successor United States Trustee as of the relevant time.

41.    "UNSECURED CLAIM" shall mean any claim which is not a Secured Claim, Priority Claim, Administrative Claim, or an unclassified claim or the kind described in Section 507(a)(7) of the Bankruptcy Code.

42.    "UNSECURED CREDITORS' COMMITTEE" or "COMMITTEE" means the Official Committee of Unsecured Creditors, appointed by the United States Trustee in the Debtor's case, as amended or modified by the addition or removal of members from time to time by the United States Trustee or Bankruptcy Court.

A term used in this Plan that is not defined in this Plan but that is used in the Bankruptcy Code has the meaning assigned to the term in the Bankruptcy Code.

///

### III.    ADMINISTRATIVE AND UNCLASSIFIED CLAIMS

### ADMINISTRATIVE CLAIMS:

All costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtor's Estate, all allowances, including professional fees and costs, approved by the Bankruptcy Court, and any other costs and expenses entitled to priority pursuant to 11 U.S.C. §§ 507(a)(1) and (2) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on or before the Effective Date, as that term is defined herein, of the Plan.  The holders of these claims include the attorneys and accountants for the Debtor, attorneys for the Committee, unpaid post-petition accounts payable (if any), estimated cure amounts for all assumed executory contracts and unexpired leases, and all fees to be paid to the Office of the United States Trustee.

The estimated administrative expenses for the Debtor's reorganization proceeding consist of the following:

| Amount | Description |
|---|---|
| $0.00 | Fees that are owed the U.S. Trustee's Office for the applicable quarter of 2024 prior to the Confirmation Date [payment is anticipated to be made when due.] |
| $550,000.00 | Estimated administrative professional legal fees and costs for the Debtor's general bankruptcy attorneys, Fletcher & Lee, Ltd. (estimated at $350,000) and Harris Law Practice LLC (estimated at $200,000), calculated as of the Confirmation Date.  Of this estimated amount, $0.00 has been approved by the Court in an interim application for compensation; however, the Court issued the Administrative Order Establishing Procedures for Interim Monthly Payment of Expenses of Professionals, which allows general bankruptcy counsel to be paid 80% of its fees each month if Reviewing Parties, as defined in the Order, do not object.  Docket No. 123.  As of the date of filing, $159,905.94 has been paid to Fletcher & Lee, Ltd. and $17,822.63 has been paid to Harris Law Practice, LLP as general bankruptcy counsel post-petition. |
| Unknown | Estimated administrative professional legal fees and costs for the Committee's attorneys, Porter Simon PC, calculated as of the Confirmation Date.  Of this estimated amount, $0.00 has already been approved by the Court on an interim basis and paid by the Debtor. |
| $0.00 | Post-petition accounts payable [all post-petition administrative expenses are expected to be paid in full in the ordinary course of business prior to the Confirmation Date]. |

| Unknown | Reservation of rights by Reno City Center, LLC and/or GPWM QOF Manager, LLC to file an administrative claim for repayment for post-petition payments to the Debtor's professionals and/or for operating expenses paid under unsecured loan advances in the ordinary course of business pursuant to 11 U.S.C. § 364(a). |
| $2,747,496.48 | Estimated cure amount for assumption of the Lease Agreement with PKWY Management, LLC pursuant to 11 U.S.C. § 365(b)(1)(A).[1] |

Professional fees shall continue to accrue up through and subsequent to the Confirmation Date, with final amounts owing subject to Court approval.

## UNCLASSIFIED PRIORITY CLAIMS:

1.    **Description**.  The Debtor's priority claims are as follows:

| Name | Scheduled Amount | Proof of Claim Amount | Allowed Priority Amount |
|------|------|------|------|
| State of Nevada Department of Taxation | None | $6,480.87 | $0.00 |

Pursuant to the Plan, the treatment and disposition of the unclassified priority claims, now totaling $6,480.87 pursuant to a filed proof of claim, will be as follows: Any claim discrepancy will be resolved by the claim objection process as set forth in Article XVII of the Disclosure Statement, with the stipulated amount and/or Court deemed amount owing used to calculate that particular creditors' allowed claim being paid by the Debtor.  All unclassified priority creditors shall be paid 100% of their allowed claim amount, with statutory interest thereon, over a one (1) year time period commencing on the Effective Date of the Plan.  The payments shall be made monthly, equally amortized over twelve (12) months, with statutory interest accrued thereon, but without any penalties.  At the option of the Debtor, any allowed priority claims may be paid on a shortened time schedule from the one (1) year described hereinabove.  In the event the Debtor fails to make the payments as set forth hereinabove, the allowed priority creditors, if any, shall have the right to proceed with any administrative remedies available to them, thirty (30) business days after written notice of default has been given to the Debtor and its attorneys, Elizabeth Fletcher, Esq. and Norma Guariglia, Esq.

---

[1] Contingent on the confirmation of the Second Amended Plan, the administrative claimant has agreed to payment on different terms and is not requiring payment on the Effective Date.

#### IV.     <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>

Pursuant to Section 1122 of the Bankruptcy Code, known claims against the Estate (as may be amended by additional claims filed before the claims bar date) have been divided into the following classifications for purposes of administration and voting on the Plan:

1.     **<u>CLASS 1 CLAIM [ALLOWED SECURED CLAIM OF DELPHI CRE FUNDING]</u>**: This Class consists of the allowed secured claim of Delphi CRE Funding, LLC in the reduced amount of $47,500,000 as of August 29, 2024, secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing ("<u>DOT</u>")[2] encumbering the Debtor's personal property and real property located at 219 University Way, Reno, Nevada 89501 and bearing APNs 011-052-32, 011-052-33; 011-052-35, 36 & 44; 011-052-37, 011-052-38, 011-052-39. 011-052-40, 011-052-41, 011-052-42, 011-052-43, 011-052-45, 011-052-46, 011-052-47, 011-052-48, 011-370-50, 011-071-09, 011-071-25, 011-071-26, and 011-370-52. This claim arises out of the loan agreement dated June 16, 2022, between the Debtor, as borrower, and Delphi, as lender, in the original principal amount of $138,371,187.00, with Debtor as the maker of the related Promissory Note A1 dated June 16, 2022, in the principal amount of $92,247,458, and Promissory Note B1 dated June 16, 2022, in the principal amount of $46,123,729. The original repayment terms of Delphi's loan can be found in the loan documents attached to Delphi's Claim 15 filed in this case.

2.     **<u>CLASS 2 CLAIMS [ALLOWED SECURED GOVERNMENT STATUTORY CLAIMS]</u>**: This Class consists of the allowed secured claims consisting of the claimants with government statutory liens against the Debtor's Project.[3] The Class 2 Claims, calculated as of the Petition Date, are detailed as follows:

| <u>Creditor Claims</u> | <u>Scheduled Amount</u> | <u>Proof of Claim Amount</u> | <u>Allowed Amount</u> |
|---|---|---|---|
| City of Reno (Sewer) | $436.41 | $687.97 | $687.97 |
| City of Reno (Sewer) | $1,725.76 | $1,603.61 | $1,603.61 |
| City of Reno (Sewer) | $2,486.50 | $2,756.45 | $2,756.45 |

---

[2] The DOT was recorded in Washoe County, Nevada, on June 17, 2022, as Doc# 5311322. Delphi also filed a UCC-1 financing statement with the Delaware Department of State on June 17, 2022.

[3] The Debtor reserves all rights with respect to the allowed amount of each claim.

| City of Reno (Sewer) | $1,081.19 | $1,296.70 | $1,296.70 |
| City of Reno (Sewer) | $3,877.20 | $3,664.31 | $3,664.31 |
| City of Reno (Sewer) | $25,051.20 | $27,484.47 | $27,484.47 |
| City of Reno (Sewer) | $18,311.19 | $24,288.83 | $24,288.83 |
| City of Reno (Sewer) | $106,250.83[4] | $116,817.74 | $116,817.74 |
| City of Reno | $93,299.17 | $93,299.17 | $93,299.17 |
| City of Reno | $75,300.08 | $75,300.08 | $75,300.08 |
| City of Reno | $41,319.22 | $41,319.22 | $41,319.22 |
| Reno Sparks Convention & Visitors Authority | $63,832.18 | $42,473.97 | Partially Disputed[5] |
| Washoe County Treasurer | $576,389.98 | $1,127,629.65[6] | $683,941.97 |

3.    **CLASS 3 CLAIMS [ALLOWED SECURED MECHANIC'S LIEN CLAIMS]**:

This Class consists of the allowed secured claims consisting of the claimants with recorded mechanic's liens against the Debtor's Project for goods and services that benefited the Debtor's Project or business operations.[7]  The Class 3 Claims, calculated as of the Petition Date, are detailed as follows:

| Creditor Claims | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| Acomb Ostendorf & Associates, LLC | $0.00 | $487,394.35 | Disputed as to classification |
| American National Insulation, Gale Building Products | $15,675.00 | None | $15,675.00 |
| Armac Construction | $100,607.75 | $91,818.22 | $90,597.94; Disputed as to classification |

---

[4] This scheduled amount includes the aggregate of claims 2.5, 2.8, 2.10, 2.17, and 2.18 on Debtor's Schedule D.

[5] The Debtor acknowledges RSCVA's statutory lien rights and reserves all rights to pursue OTM Hospitality Reno-LLC dba Reno Suites regarding payment of this claim.

[6] The claim filed by Washoe County Treasurer includes post-petition taxes in the collective amount of $443,687.68.  See Claim 60.  Post-petition installment amounts shall be paid in the ordinary course of business.

[7] The Debtor reserves all rights with respect to the allowed amount of each claim.

| | | | |
|---|---|---|---|
| Builders United LLC | $789,286.93 | None | $0.00[8] |
| Capital Glass, Inc. | $893,924.25 | None | $750,404.05 |
| Concrete Resurfacing Systems | $128,380.87 | $95,597.53 | $95,597.53 |
| Guaranteed Clear Air LLC, GCA Environmental | $77,981.00 | None | $72,445.00 |
| Intermountain Electric, Inc. | $2,841,014.34 | $3,490,695.99 | $2,841,014.34 |
| Johnson Controls Fire Protection LP | $213,209.69 | $142,196.31 | Disputed as to amount[9] |
| Johnson Controls Inc. | $25,070.00 | $25,070.00 | Disputed as to amount |
| J.W. McClenahan Co. | $1,236,766.47 | $1,122,497.80 | $1,052,189.30 |
| Moser Architecture Studio LLC | $680,735.00 | $496,688.10 | Disputed as to amount |
| Mt. Rose Heating & Air Conditioning, Inc. | $389,201.04 | $559,882.16 | $389,201.14 |
| National Ceramic Tile & Stone Corp. | $199,925.00 | $181,395.00 | Disputed as to amount |
| National Ceramic Tile & Stone Corp. | None | $18,530.00 | Disputed[10] |
| Optimum Flooring | $89,151.00 | $196,163.55 | Disputed as to classification; $147,122.66 |
| Nelson Wilcox Structural Engineers PC | $43,230.00 | $43,230.00 | $43,230.00 |

[8] Builders United LLC contracted with PKWY Management, LLC and performed work for that entity, which will pay (and has been paying) this claim.

[9] Johnson Controls Fire Protection LP released three of its four liens recorded against the Debtor's property.  See Document Nos. 5488247; 5488743; and 5488752 on file with the Official Records, Washoe County Recorder.  The Debtor reserves all rights to object to the proof of claim filed by Johnson Controls Fire Protection LP based on the bifurcation of its claim within the secured and unsecured classes.

[10] National Ceramic Tile & Stone Corp. filed Claim 65 late, after the claims bar date.  The Debtor reserves all rights with respect to this claim.

| Sherwin Williams Company | $19,102.50 | $19,102.50 | $19,102.50 |
| TK Elevator Corp. | $1,089.054.15 | $6,111,437.30 | Disputed as to amount and classification |

4.      **CLASS 4 CLAIMS [ALLOWED UNSECURED CLAIMS]**: This Class consists of the Debtor's allowed general unsecured claims for goods and services that benefited the Debtor's Project or business operations.[11]  The Class 4 Claims, calculated as of the Petition Date, are detailed in the attached **Exhibit 1**.

5.      **CLASS 5 CLAIM [ALLOWED UNSECURED CLAIM OF DELPHI CRE FUNDING, LLC]**: This Class consists of the allowed unsecured deficiency claim of Delphi CRE Funding, LLC in the amount of $58,904,600 as of August 29, 2024.  This claim arises out of the loan agreement dated June 16, 2022, between the Debtor, as borrower, and Delphi, as lender, in the original principal amount of $138,371,187.00, with Debtor as the maker of the related Promissory Note A1 dated June 16, 2022, in the principal amount of $92,247,458, and Promissory Note B1 dated June 16, 2022, in the principal amount of $46,123,729. The original repayment terms of Delphi's loan can be found in the loan documents attached to Delphi's Claim 15 filed in this case.

6.      **CLASS 6 CLAIMS [DISPUTED INSIDER CLAIMS]:** This Class consists of claims filed by Christopher Beavor and his related entities.  The Class 6 Claims, calculated as of the Petition Date, are detailed as follows:

| **Creditor Claims** | **Scheduled Amount** | **Proof of Claim Amount[12]** | **Allowed Amount** |
|---|---|---|---|
| Luxe Industries, LLC | $9,823,446.94 | $18,919,689.94 | Disputed |
| CAI Reno Hotel OZ Fund, LLC | None | $101,975.53 | Disputed |

---

[11] The Debtor reserves all rights with respect to the allowed amount of each claim.

[12] Many of the Class 6 claimants include allegations of various litigation claims against the Debtor in "unknown" amounts, which amounts are not reflected in this table.

14

| Bristlecone Management, LLC | $199,018.34 | $199,018.34 | Disputed |
|---|---|---|---|
| CAI Development, LLC | $103,120.12 | $33,820.12 | Disputed |
| CAI Investments, LLC | $987,091.50 | $855,234.71 | Disputed |
| CAI Investments Healthcare Products II, DST | None | $229,281.58 | Disputed |
| CAI Investments Sub Series 300, LLC | None | $100,000.00 | Disputed |
| CAI Reno Hotel Partners, LLC | None | $133,704.30 | Disputed |
| CAI Tempe Hotel Partners | None | $240,000.00 | Disputed |
| Chrisopher Beavor | None | $138,371,187.00 | Disputed |
| PFM Harvard, LLC | None | $77,500.00 | Disputed |
| Silver State Realty & Investments | $601,198.20 | $723,098.80 | Disputed |

7.    **CLASS 7 EQUITY INTERESTS OF RENO CITY CENTER OWNER, LLC**: This Class consists of Reno City Mezzanine Borrower, LLC's 100% member's interest in Reno City Center Owner, LLC as of the Petition Date.

## V.    TREATMENT OF CLASSES

1.    **CLASS 1 CLAIM [ALLOWED SECURED CLAIM OF DELPHI CRE FUNDING]**:  The Class 1 allowed secured claim of Delphi in the reduced amount of $47,500,000 shall be paid as follows: Pursuant to the court-approved Settlement Agreement between Delphi and the Debtor, Delphi shall retain its existing liens against the Debtor's assets and Project as they existed on the Petition Date, without modification. Delphi's secured claim shall not accrue interest. The secured claim shall be paid as follows: a $10,000,000 payment on or before October 15, 2024;[13] the remaining balance of $37,500,000 due in full on or before December 31, 2024.  Under the Settlement Agreement and for additional consideration from the Debtor of this claim, no later

---

[13] RCC made the $10,000,000.00 payment on October 15, 2024 on behalf of the Debtor,.  Docket No. 289.

than December 31, 2024, the Debtor shall transfer/assign to Delphi, or its designee, all claims, causes of action and other litigation rights that the Debtor may hold, including claims arising under Title 11 of the United States Bankruptcy Code, against Christopher Beavor, Bristlecone Management, LLC, or any of their affiliates (the "Beavor Litigation"). Debtor's transfer of the Beavor Litigation to Delphi will not impair the Debtor's ability to assert any claims or defenses as needed to defend and reduce to $0 any claims against the Debtor asserted by Christopher Beavor, Bristlecone Management, LLC, or any of their affiliates.   Upon receipt of payment of $47,500,000 and transfer of the Beavor Litigation, Delphi shall release and reconvey its Deed of Trust and other security instruments recorded against the Project and Debtor's other assets.

Accordingly, the Class 1 allowed claim of Delphi is impaired under the Plan.

**2.      CLASS 2 CLAIMS [ALLOWED SECURED GOVERNMENT STATUTORY CLAIMS]**:  The Class 2 allowed secured claims as of February 16, 2024, will retain their liens as they existed on the Petition Date, and shall be paid by the Debtor upon the earlier of a sale, refinance of the Project, or in quarterly installments of $250,000 starting on January 1, 2026, and continuing on the first day of each calendar quarter thereafter until paid in full, with each quarterly payment to be distributed on a pro rata basis among all allowed Class 2 claims.

Accordingly, Class 2 allowed claims are impaired under the Plan.

**3.      CLASS 3 CLAIMS [ALLOWED SECURED MECHANIC'S LIEN CLAIMS]**: The Class 3 allowed secured claims of mechanic's lienholders as of February 16, 2024, will retain their liens as they existed on the Petition Date, accrue interest at 4% per annum from the Petition Date until paid, and shall be paid by the Debtor upon the earlier of a sale, refinance of the Project, or in quarterly installments of $1,500,000 starting on January 1, 2026, and continuing on the first day of each calendar quarter thereafter until paid in full, with each quarterly payment to be distributed on a pro rata basis among all allowed Class 3 claims.

Accordingly, Class 3 allowed claims of mechanic's lienholders are impaired under the Plan

**4.      CLASS 4 CLAIMS [ALLOWED UNSECURED CLAIMS]**: The Class 4 allowed general unsecured as of February 16, 2024, will accrue interest at 4% per annum from the Petition Date until paid, and shall be paid by the Debtor in quarterly installments of $500,000

starting on January 1, 2026, and continuing on the first day of each calendar quarter thereafter until paid in full, with each quarterly payment to be distributed on a pro rata basis among all allowed Class 4 claims.

Accordingly, Class 4 allowed claims of the Debtor's general unsecured creditors are impaired under the Plan.

5.    **CLASS 5 CLAIM [ALLOWED UNSECURED CLAIM OF DELPHI CRE FUNDING, LLC]**: The Class 5 allowed unsecured claim of Delphi CRE Funding, LLC, shall be subordinated by agreement to all other allowed unsecured claims, and Delphi will not seek payment from the Debtor pursuant to the Parties' Settlement Agreement. The Class 5 allowed unsecured claim shall remain a valid claim for all other purposes.

Accordingly, the Class 5 allowed unsecured claim of Delphi CRE Funding, LLC is impaired under the Plan.

6.    **CLASS 6 CLAIMS [DISPUTED INSIDER CLAIMS]:** The Class 6 disputed insider claims filed by Christopher Beavor and his related entities will not receive any payment from the Debtor unless those claims are allowed by the Court or by agreement with the Debtor. Any allowed Class 6 Claims shall be paid as follows: Class 6 allowed insider claims will be equitably subordinated to all allowed unsecured claims to the level of equity pursuant to 11 U.S.C. § 510(c) and accrue interest at 4% per annum from the Petition Date until paid. Class 6 claims shall be paid by the Debtor in quarterly installments of $250,000 starting on January 1, 2026, and continuing on the first day of each calendar quarter thereafter until paid in full, with each quarterly payment to be distributed on a pro rata basis among all allowed Class 6 insider claims. In the event the Court determines any allowed Class 6 claims cannot be equitably subordinated under 11 U.S.C. § 510(c) to the level of equity, any allowed non-subordinated Class 6 claims shall be paid in full before any distributions to equity holders.

Accordingly, the Class 6 disputed insider claims are impaired under the Plan.

7.    **CLASS 7 EQUITY INTERESTS OF RENO CITY CENTER OWNER, LLC**: The Class 7 equity interests of Reno City Center Owner, LLC, as of the Petition Date, shall not be modified. Accordingly, the Class 7 equity interests of Reno City Center Owner, LLC are

unimpaired under the Plan.

## VI. TREATMENT OF EXECUTORY CONTRACTS, NON-EXECUTORY CONTRACTS, UNEXPIRED LEASES AND DISPUTED CLAIMS

### 1. EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

Reservation of Rights.   The Debtor reserves the right to assume or reject, pursuant to Section 365 of the Bankruptcy Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date.   All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which an application to reject shall not be pending on the Confirmation Date shall be deemed rejected by the Debtor.   The debtor hereby intends to assume or reject its leases and executory contracts as follows:

| OTHER PARTY | DESCRIPTION | ASSUME/REJECT |
|---|---|---|
| Fitzgerald Virginia & Plaza LLC | Parking Lease Agreement | REJECT |
| PKWY Management, LLC | Tenant Lease Agreement for Suites W1-2 and W1-7 at 210 N. Virginia Street, Reno, NV 89501 | ASSUME[14] |
| Sartini Gaming, LLC | Interim Management & Operating Agreement related to Project's nonrestricted gaming right | ASSUME |
| City of Reno | Development Agreement for Sewer Fee Deferral | ASSUME |
| Luxe Industries LLC | Standard Form of AIA Agreement | REJECT (TERMINATED PRE-PETITION)[15] |
| TK Elevator Corp. | Agreement for the Modernization of 18 Elevators dated July 30, 2021 | REJECT |
| TK Elevator Corp. | Bronze Service Agreement dated June 8, 2021 | REJECT |

---

[14] Assumption of the PKWY Lease requires the Debtor to cure amounts due under the PKWY Lease pursuant to 11 U.S.C. § 365(b)(1)(A), which will require payment of approximately $2,747,496.48 to PKWY.

[15] Debtor alleges this agreement was either breached and/or terminated prepetition. But if it is later determined that the agreement was still in effect on the Petition Date, the Debtor rejects it.

| ClearCapital.com, Inc. | Tenant Lease Agreement for Suites W2-3, W3-1 & W4-2 of 210 N. Virginia St., Reno, NV 89501 | REJECT (TERMINATED PRE-PETITION)[16] |
|---|---|---|
| CAI Investments, LLC | Tenant Lease Agreement for Suites W1-1 of 210 N. Virginia St., Reno, NV 89501 | REJECT |

## 2. DISPUTED CLAIMS.

The Debtor will only make distributions according to the Plan and when claims become allowed claims as such terms are defined in the Plan. There are currently claims pending against the Debtor, either filed or scheduled, which are or will become Disputed Claims. As to some Disputed Claims, the Debtor disputes only the classification of the claims asserted by the holder. With respect to other Disputed Claims, the Debtor accepts the classification asserted by the holder but disputes the amount of the claim alleged by such holder. In some cases, the Debtor disputes both the asserted classification and the alleged amount. In addition, the Debtor and other parties in interest may object to certain other claims based upon equitable or contractual subordination pursuant to Section 510 of the Bankruptcy Code. Specifically, such subordination claims may be asserted against any person or entity buying claim(s) for speculation and profit in the Debtor's bankruptcy case. No distribution will be made with respect to any such Disputed Claims unless and until they become allowed claims.

Claim Objections. Objections to Claims shall be filed with the Court and served upon each holder of a Claim to which objection is made no later than one hundred twenty (120) days after the Effective Date.

Payment Procedures. Payments to the holder of a Claim to which an objection has been filed that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class of Creditors to which the holder of such an Allowed Claim belongs. Interest, if any, on any funds reserved for a contested claim shall inure to the benefit of the holder of such an Allowed Claim.

---

[16] Debtor disputes this lease and alleges the tenant breached and terminated it prepetition. But if it is later determined that the lease was still in effect on the Petition Date, the Debtor rejects it.

19

Avoidance Actions. In accordance with 11 U.S.C. § 1123(b), the Debtor shall retain and may enforce any claims, rights, and causes of action that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under Sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code other than the Beaver Litigation, as that term is defined in the Settlement Agreement with Delphi. To the extent appropriate, the Debtor shall reserve and have the right to bring any and all avoidance actions, the same to be commenced within one (1) year after the Effective Date. Proceeds of all avoidance actions shall vest in the Debtor pursuant to 11 U.S.C. §1141.

Litigation Claims. In accordance with 11 U.S.C. § 1123(b), the Debtor shall transfer and assign to Delphi CRE Funding, LLC as part of the Parties' Settlement Agreement the Beavor Litigation, as that term is defined in the Settlement Agreement. The Debtor shall retain all other claims, rights, and causes of action that the Debtor or its bankruptcy estate may hold against any other person or entity, including, without limitation, claims and causes of action arising under Sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code. To the extent appropriate, the Debtor shall reserve and have the right to commence any and all actions on contingent and unliquidated litigation claims within one (1) year of the Effective Date except for the Beavor Litigation claims that the Debtor shall transfer to Delphi under the parties' Settlement Agreement, proceeds of all litigation claims shall vest in the Debtor pursuant to 11 U.S.C. § 1141. The Debtor is currently aware of the following potential litigation claims:[17]

- Potential direct and derivative claims, including but not limited to, fraudulent transfer against CAI Reno Hotel OZ Fund, LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, breach of fiduciary duty, theft, embezzlement, and fraudulent transfer against Bristlecone Management, LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, fraudulent transfer

---

[17] Beavor filed proofs of claims for certain affiliated entities in June 2024. Some of the entities that filed claims in this case are not listed in subsection (d). Upon further investigation, the Debtor may discover litigation claims against such entities similar to those already listed in subsection (d). The Debtor reserves all rights to amend the Disclosure Statement and Plan to list such claims.

against CAI Development, LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, breach of lease agreement against CAI Investments, LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, fraudulent transfer against CAI Investments Healthcare Products II, DST (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, breach of contract and unjust enrichment against CAI Investments Sub Series 300 LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, fraudulent transfer against CAI Reno Hotel Partners LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to fraudulent transfer against CAI Tempe Hotel Partners, LLP (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, breach of fiduciary duty, theft, embezzlement, and fraudulent transfer against Christopher Beavor (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, fraudulent transfer against PFM Harvard, LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, fraudulent transfer against Silver State Realty & Investments (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, fraudulent transfer against Luxe Industries, LLC (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, fraudulent transfer against Healthcare Products I Holdings (included in the Beavor Litigation claims to be transferred to Delphi pursuant to the Settlement Agreement);

- Potential direct and derivative claims, including but not limited to, lender liability against Delphi CRE Funding, LLC.  Such claims will be released through the Settlement Agreement between the Debtor and Delphi.

- Potential direct and derivative claims, including but not limited to, breach of lease agreement against ClearCapital.com, Inc.

- Potential direct and derivative claims, including but not limited to, breach of lease agreement against OTM Hospitality-Reno, LLC.

- Potential direct and derivative claims, including but not limited to, breach of contract, breach of fiduciary duty, and negligence against Acomb Ostendorf & Associates, LLC.

The Debtor expressly reserves the right to pursue these litigation claims and other related claims against these parties and any of their predecessors, successors, and assigns, and also their insurance providers, sureties, and guarantors.

## VII.    STATEMENT OF IMPAIRMENT

The following classes are impaired and therefore entitled to vote for the Plan—Class 1, Class 2, Class 3, Class 4, Class 5, and Class 6.  The remaining classes are unimpaired, do not vote, and pursuant to the Bankruptcy Code are deemed to have accepted the Plan.

## VIII.    MEANS FOR EXECUTION OF THE PLAN

### A.    Proposed Plan New Funding

The Debtor intends to fund its Plan and ongoing construction and business operations from a combination of equity contributions, tenant improvement funding, and new financing detailed as follows:

1.    **Senior Lender-Bridge Loan**: The Debtor is in the process of obtaining a senior secured bridge loan from a commercial lender to fund the payments as proposed in the Plan. The Debtor's grandparent, RCC has engaged both Colliers and Hillstone Capital to secure bridge financing to fund the payment due to Delphi on December 31, 2024, and to pay other existing allowed secured claims of mechanic's lien and statutory lienholders.  Colliers and Hillstone Capital have obtained interest from lenders currently underwriting the loan and expect to have the financing in place to make all necessary payments by December 31, 2024.  *See* letter dated October 27, 2024, from Colliers' Vice Chair–Western U.S. Capital Markets, attached as **Exhibit 2**.  Debtor has been advised by both Colliers and Hillstone Capital that the proposed loan terms will consist of usual and customary terms for a secured commercial loan of this size.  If the Plan is not expected

to be confirmed by the time the lender expects to fund the loan, the Debtor will file a motion with the Court seeking authorization for this senior loan pursuant to 11 U.S.C. § 364.

2.    **Equity Investment ($10,000,000.00):** The Debtor's grandparent, RCC, through its investors paid the initial $10,000,000 payment due to Delphi pursuant to the Parties' Settlement Agreement on October 15, 2024. RCC reserves the right to treat the $10,000,000 as an ordinary course unsecured loan to the Debtor under 11 U.S.C. § 364(a) and to seek allowance of the payment as an administrative expense.

3.    **Preferred or Other Equity Investments ($5,000,000):** The Debtor expects one or more investors to invest $5,000,000 in the Project, which will be used to pay upcoming operating and administrative expenses.  The investor(s) will take an equity position in the Debtor's grandparent, RCC. RCC reserves the right to treat the $5,000,000 as an ordinary course unsecured loan to the Debtor under 11 U.S.C. § 364(a) and to seek allowance of the payment as an administrative expense.

4.    **Tenant Improvements ($10,000,000):** PKWY Management, LLC ("PKWY") is the existing restaurant tenant on the leasehold premises subject to a lease agreement and subsequent amendments between PKWY and the Debtor.[18]  The leased space pursuant to the Second Amended Lease consists of 21,295 square feet, of which 18,337 square feet is primary space, 2,958 square feet is basement space, and 1,270 square feet is the patio space. Attached as **Exhibit 3** is a copy of the Second Amended Lease.  PKWY has already spent approximately $10,000,000 on improvements to this space.  The Second Amended Lease provides for PKWY to assume the Debtor's obligation under prior leases for installation of tenant improvements.  The Debtor shall pay $35 per square foot of primary space and basement space and reimbursement for some work performed by Tenant in Landlord's space, which amounts to approximately $745,000.

---

[18] PKWY initially entered into a lease agreement with Reno City Center, LLC in 2021 ("Initial Lease") to lease 15,459 square feet of space at the Property.  The Initial Lease was amended in 2022 (the "First Amended Lease").  The First Amended Lease has been amended to provide that the Debtor is the Landlord and to document the additional space leased by PKWY (the "Second Amended Lease").  The Debtor intends to assume the current the First Amended Lease with PKWY and cure any defaults, as set forth herein.

To the extent that the Plan is confirmed, PKWY's secured and unsecured claims will be satisfied in full by the agreement in the Second Amended Lease.

The parties are also in the process of negotiating an additional lease(s) or lease amendment(s) that could expand the square footage from the Second Amended Lease by approximately 10,000 square feet in the west podium area, in addition square feet of basement area and up to 40,000 square feet of the plaza located in front of the real property and located at the corner of North Virginia Street and East Commercial Row, which is the location of the Reno Arch.  As noted, under the current lease, PKWY has already invested approximately $10,000,000 to improve its 21,295 square feet of space, which will include 2 restaurants, a bar and gaming.  The restaurants will open to the plaza where there will be outdoor seating areas, weather permitting.  Future leased areas would include additional Tenant improvement dollars not yet determined.

PKWY intends that construction will begin prior to or immediately following confirmation of this Plan.  PKWY has a contractor that will begin construction as soon as possible.  Completion of construction will allow PKWY to begin operating and completing the plaza will also serve the higher purpose of greatly improving the aesthetics of the overall Project, which, in turn, will attract restaurant and retail patrons in addition to additional commercial tenants.

**5.     Construction Loan:** The Debtor has obtained an estimate from Ahlquist for the cost to complete construction of the Project in the total amount of approximately $110,000,000+, which includes an 8% contingency.  A copy of the cost to complete is attached as **Exhibit 4**. The Debtor is seeking construction financing and expects to obtain the necessary loan by March 2025 sufficient to cover the costs of completion which will consist of standard terms for a commercial construction loan of this size.

**6.     CPACE  Financing ($35,000,000):** The Debtor is in the process of obtaining Commercial Property Assessed Clean Energy ("CPACE") financing in the amount of $35,000,000.  CPACE is a financing mechanism in which building owners and developers can access the capital they need to make energy deferred maintenance upgrades in existing buildings and to support new construction.  Repayment occurs through a benefit assessment on the property

tax bill over a period of time that matches the useful life of the improvements or new construction, generally 20 – 30 years.  CPACE financing usually has the following terms:

- o Fixed Rate: there is a fixed rate over the term of 30 years.  The financing is non-recourse and requires no personal or business guarantee. Further, the amount cannot be accelerated even upon a foreclosure, at which point, only the amounts in arrears would be due and payable.
- o No Prepayment Penalty after 15 years.
- o Capitalized Interest: Interest reserve, capitalized and amortized into the funding balance, to cover the period between initial funding and the first payment in May 2026.
- o Transferable: in the event of a sale or a foreclosure, the financing can be transferred to the future buyer without penalties or approvals required by the lender.
- o Fully Funded at Closing: Debtor would receive the full amount of financing at closing with no funds required for a down payment.
- o Escrow Account: funds *can be* (but do not have to be) put into a tax and insurance escrow account to cover the increased tax assessments.  In that sense, any senior lender can be assured that if it must foreclose, the funds for any increased but unpaid taxes related to the CPACE financing are readily available; thus, **a senior lender is fully protected from the increased funding**.
- o Enhanced Property Value: the sustainable nature of the construction results in lower operating costs and a higher property value.

The Debtor anticipates the CPACE loan will be funded concurrently with the construction loan described above.  The Debtor has already started the process and has the assurance of the lender that it qualifies for this program.  Attached as **Exhibit 5** is a copy of the non-binding term sheet from CPACE.

## Summary

In sum, the Debtor obtained $10,000,000 in funding indirectly from RCC on October 15, 2024, which was used to make the first settlement payment to Delphi. The Debtor also expects to

obtain further funding from RCC in the amount of $5,000,000 to pay upcoming operating and administrative expenses. The Debtor also expects to borrow from a commercial lender for a bridge loan, secured by a first priority deed of trust against the Project, in an amount sufficient to fund the remaining payment to Delphi and to pay other valid liens against the Project.  The Property will also benefit from the additional $10,000,000 in tenant improvements that have already been completed.  Debtor expects to obtain construction financing estimated in the approximate amount of $110,000,000+, which is the cost of completion of the Project.  Along with the construction loan, Debtor expects to have another $35,000,000 from the CPACE program.

**Thus, in all, the Debtor has received $10,000,000 in funds to pay the first settlement payment to Delphi and expects to have approximately $5,000,000 in further funds from an equity investor in RCC to fund operations, a bridge loan from a senior lender of at least $37,500,000 plus the amount of valid and allowed lien claims, $10,000,000 in completed improvements from PKWY, a construction loan to cover the costs of completion and an additional $35,000,000 in CPACE financing.**  These funding sources will allow the Debtor to pay Delphi, valid secured creditors and fund the remaining costs of construction for the Project, which will, in turn, allow the Project to commence earning regular leasing revenues to be used to pay unsecured creditors.

**B.    Use of Funds**

Debtor proposes to use the above funds (and anticipated future funds), in the following order:

**1.    Delphi and Other Allowed Secured Claims.** On behalf of the Debtor, RCC indirectly paid the agreed-upon first settlement payment to Delphi of $10,000,000 on October 15, 2024. The senior secured bridge loan proceeds expected before December 31, 2024, will be used to pay Delphi's remaining allowed secured claim of $37,500,000 on or before December 31, 2024, in addition to payment of other allowed claims secured by valid liens against the Project.

**2.    Monthly Operating Expenses.** Debtor will pay insurance, taxes, essential payroll (hotel staff, maintenance and security) and utilities.

**3.** **Allowed Administrative Expenses.** The Debtor will pay allowed administrative expenses on the Effective Date unless an administrative claimant agrees to alternative treatment.

**4.** **Design Permits.** Debtor will obtain updated designs and permits through its new developer and general contractor (more information below).

**5.** **Payments to Cure Assumed Executory Contracts and Unexpired Leases.** The Debtor proposes to assume and pay cure amounts for certain contracts and leases that are critical to the Project.

**6.** **Completion of Construction in Phases.** Pursuant to a Project Schedule prepared by Ahlquist, Ahlquist commenced preconstruction services commenced last month. The Debtor will pay Ahlquist and ESI for construction services fees pursuant to agreements. Further construction of various portions of the Project intends to commence starting in March 2025, with substantial completion of the entire Project expected in 2027. A copy of the Project Schedule is attached as **Exhibit 6.**

**C. Developers and Designers**

As mentioned previously, the Debtor has entered into a Development Services Agreement with Ahlquist, LLC, an Idaho limited liability company, which is a profits interest owner in Debtor's grandparent, RCC, to be the new developer and manager for the Project. Ahlquist is a full-service development firm with an excellent regional reputation in the industry. A description of Ahlquist's background and key personnel can be found at **Exhibit 7**.

Ahlquist, in turn, has retained Engineered Structures, Inc. ("ESI") as the general contractor on the Project. ESI is a nationally recognized general contractor with the experience, personnel, and ability to complete construction of the Project. ESI has experience in the State of Nevada, specifically in Reno. More information about ESI can be seen on its website at: https://esiconstruction.com/.

The Debtor has also received a Letter of Intent from Journey Corporate Holdings, LLC, d/b/a/ ICRAVE, to provide conceptual and experiential vision and interior design and lighting design services. ICRAVE, established in 2002, has provided comprehensive design services for

numerous large-scale projects such as Sphere in Las Vegas, TSX Entertainment in Times Square, the Dream Hotel at Miami's Riverside Wharf along with numerous award-winning restaurant locations.  Attached as **Exhibit 8** is a copy of the ICRAVE letter in support of the Project.

### D.  Post-Confirmation Default

In the event the Debtor becomes delinquent in any duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtor and its counsel.  The Debtor shall thereafter have thirty (30) business days from receipt of said notice in which to cure the default.  In the event such default remains uncured, the affected creditor or creditors shall be entitled to foreclose upon any collateral (if a secured creditor) or take other appropriate action.  The Debtor shall have the right to bring the issue of default before the Bankruptcy Court.  At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtor to cure the default in a reasonable period of time.  The Bankruptcy Court may also consider conversion of the case to one under Chapter 7 of the Bankruptcy Code or dismissal of the same is in the best interest of creditors.

### E.  Professionals' Fees

After the Confirmation Date of the Plan, the Debtor and any other professional, such as Debtor's general bankruptcy counsel, Committee's counsel, any special purpose counsel, or accountants, will not be required to apply to the Court for compensation for services rendered post-confirmation.  Post-confirmation compensation of the Debtor's professionals shall be at their normal hourly rate(s) and customary cost charges.

### F.  Distribution

All cash proceeds shall be distributed in the foregoing manner except amounts necessary to pay disputed claims against the Debtor in the event they are allowed, which shall be held as a reserve and paid as such claims are determined by agreement between the parties or as are judicially determined.

### G.  Taxes

Unless otherwise provided in the Plan, there are no income tax liens on real or personal property owed by the Debtor.  The Debtor is not aware of any material tax consequences from the

proposed Plan that would affect it because it is a limited liability company. All tax benefits and liabilities flow through to the Debtor's equity holder. In accordance with 11 U.S.C. § 1146(a), any property transfers or sales by the Debtor as a result of this Plan may not be taxed under any law imposing a stamp tax or similar tax, including real property transfer taxes.

## H.    **General Risk Factors.**

The Plan and its implementation are subject to certain risks, including the fact that the Plan may not be accepted by the requisite number of Creditors to confirm the Plan. Even if the Plan receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, the Debtor cannot provide assurances that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan.

If the Plan is not confirmed, the Debtor will need to revise the Plan, and it is unclear whether an alternative chapter 11 plan could be implemented and what distribution the holders of Allowed Claims and Interests would receive. If an alternative could not be agreed to, it is possible that the Debtor would have to liquidate its assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan, and Interest Holders would likely receive nothing.

Debtor's financial projections are estimates only and not promises of future performance. The financial projections are subject to common risk factors existing for any forward-looking projections, meaning that the projections are based on current known market conditions and assumptions. Any significant changes in the national economy or other outside factors could materially affect the financial projections for better or worse. There can be no assurances that the estimated proceeds on which future distributions have been projected in the Plan will be realized by the Debtor. There can also be no assurances that the estimated Claim amounts set forth in the

Plan for unliquidated, contingent, or disputed Claims are correct. The estimated amounts are based on certain assumptions and facts believed by the Debtor with respect to a variety of factors that have not yet been adjudicated by any court. Both the actual amount of Allowed Claims in a particular Class and the Allowed amount of funds available for distribution to such Class may differ from the estimates in the Plan. If the total amount of Allowed Claims or Interests in a Class is higher than the estimates, such Claims or Interests may take longer to pay or may ultimately receive less than projected in the Plan.

## IX.    MISCELLANEOUS PROVISIONS

**1.    Effective Date**.

The Effective Date shall be the earlier of sixty (60) days after the entry of the Confirmation Order or December 31, 2024, if the lender requires an effective date prior to the end of 2024

**2.    The Disbursing Agent**.

The Debtor is ultimately responsible for making all distributions pursuant to the Plan.

**3.    Unclaimed Distributions**.

Any property to be distributed pursuant to the Plan, if not claimed by the distributee within one (1) year after the payment, shall be returned to the Debtors and forfeited by the distributee.

**4.    Effect of Confirmation**.

Upon confirmation and performance of the Plan, the Debtor shall be discharged from any debt that arose before the date of Confirmation, and any debt of a kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, to the full extent permitted by 11 U.S.C. § 1141(d).  In addition, pending execution of the Plan, and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors and parties in interest shall be stayed from proceeding against the Debtor's assets including stay of default proceedings.

**5.    Exculpation**.

The Debtor, nor any of its respective members, managers, officers, directors, employees, representatives, professionals or agents, will have or incur any liability to any Creditor for any act or omission in connection with or arising out of the Reorganization Case, including, without limitation, prosecuting confirmation of this Plan, consummation of this Plan, or the administration

of this Plan or the property to be distributed under this Plan, except for breach of fiduciary duty, gross negligence, willful misconduct, or fraud.

6. **Notice**.

Any notice described in or required by the terms of this Plan, or the Code and Rules shall be deemed to have been properly given when actually received or if mailed, five (5) days after the date of mailing, if such shall have been sent by certified mail, return receipt requested, and if sent to:

The Debtor, addressed to:

ELIZABETH FLETCHER, ESQ.
FLETCHER & LEE
448 Ridge Street
Reno, Nevada 89501

    and

NORMA GUARIGLIA, ESQ.
HARRIS LAW PRACTICE LLC
850 E. Patriot Blvd., Suite F
Reno, Nevada 89511

7. **Headings**.

The headings used herein are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

8. **Severability**.

Should any provision of this Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability of any and all other provisions of this Plan.

9. **Governing Law**.

Except to the extent that the Bankruptcy Code or other applicable federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed in accordance with the laws of the State of Nevada, notwithstanding any conflict of law principles.

10. **Successors or Assigns**.

The rights, duties and obligations of any Person named or referred to in this Plan shall be

31

binding upon and shall inure to the benefit of the successors and assigns of such person.

**11. <u>Designation of Managers and Governance Issues</u>**.

The Debtor's operations will be managed post confirmation by the managers of RCC which is the sole equity holder of Mezzanine, Debtor's sole equity holder, specifically, RCC Manager LLC and GPWM QOF Manager LLC. The human representatives of these entities who are most involved in the Debtor's operations are Kirk Walton and Philip Oleson, Managing Members of GPWM QOF Manager LLC. As explained above, the Debtor has entered into an agreement with Ahlquist, the new developer for the Project, who will manage the future construction and development of the Project under the direction and oversight of the Debtor's Manager, Reno City Center, LLC, via RCC Manager LLC and GPWM QOF Manager LLC. Ahlquist has also retained ESI as the general contractor for the Project. The Debtor will compensate Ahlquist as set forth in the agreement. The Debtor's corporate managers will receive no compensation from the Debtor, other than reimbursement for out-of-pocket expenses incurred in the course of the Debtor's business.

**12. <u>Post Confirmation Reporting and Payment of US Trustee Fees</u>**.

Post Confirmation, the Reorganized Debtor shall continue filing monthly operating reports through the Effective Date.  After the Effective Date, the Reorganized Debtor and any other authorized parties who have been charged with administering the confirmed plan shall file post confirmation reports in the manner prescribed by 11 U.S.C. § 1106(a)(7) and Fed. R. Bankr. P. 2015(a)(5) for every calendar quarter through the date the Court enters a final decree closing this case, an order dismissing the case, or an order converting the case to another chapter in bankruptcy.

Until the Effective Date of a confirmed plan, the Debtor shall timely pay the U.S. Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6).  After the Effective Date, the Reorganized Debtor and any other authorized parties who have been charged with administering the confirmed plan shall be responsible for the timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6) until the Court enters a final decree closing the case, an order dismissing the case, or an order converting the case to another chapter in bankruptcy.

The resumption of the filing of post confirmation reports and the payment of fees shall

occur if an order has been entered on the docket that vacates any of the above orders or reopens the case for a reason other than that which is purely administrative.

## X.    MODIFICATION OF THE PLAN

The Debtor will have the right to modify this Plan in accordance with the provisions of the Bankruptcy Code and Chapter 11.  In this regard:

1.    In accordance with Section 1127(a) of the Bankruptcy Code and Chapter 11, 11 U.S.C. § 1127(a), modification(s) of this Plan may be proposed in writing by the Debtor at any time(s) before confirmation, provided that the Plan, as thus modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and Chapter 11, 11 U.S.C. §§ 1122 and 1123, and the Debtor complies with Section 1125 of the Bankruptcy Code and Chapter 11, 11 U.S.C. § 1125.

2.    In accordance with Section 1127(b) of the Bankruptcy Code and Chapter 11, this Plan also may be modified by the Debtor at any time(s) after confirmation and before substantial consummation of this Plan, provided that the Plan, as thus modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code as more fully set forth in Section 1127.

3.    Any holder(s) of a claim that has accepted or rejected the Plan will be deemed to have accepted or rejected, as the case may be, the Plan as modified unless, within the time fixed by the Court for doing so, such holder(s) changes their previous acceptance(s) or rejection(s).

4.    Every modification of this Plan will supersede the previous version(s) of the Plan and whenever each such modification is effective as provided in this Article X.  When superseded, the previous version(s) of the Plan will be in the nature of withdrawn or rejected settlement proposal(s), and will be null, void, and unusable by the Debtor or any other party for any purpose(s) whatsoever with respect to any of the contents of such version(s) of the Plan.

## XI.    DISCHARGE AND STAY CONTINUATION

Confirmation and performance of this Plan will discharge the Debtor from any and all debts to the extent provided under Section 1141(d) of the Bankruptcy Code and will otherwise have all effects provided in such 11 U.S.C. § 1141, which are not expressly inconsistent with the provisions of this Plan.  Pending execution of this Plan and unless: **(a)** the Court has otherwise expressly

ordered; or **(b)** this Plan otherwise expressly provides, all creditors will continue to be stayed from proceeding against the Debtor or its assets.

<u>Post Confirmation Injunction</u>

No entity may commence, continue, or assert any claim, counterclaim, crossclaim, affirmative defense, defense, set off, recoupment or any action of any kind or nature (collectively "<u>Potential Actions</u>") against the Debtor. Confirmation of the Plan shall constitute a permanent injunction against and irrevocable release of any and all Potential Action.

## XII.    <u>RETENTION OF JURISDICTION</u>

Notwithstanding confirmation of this Plan, the Court will retain jurisdiction for the following purposes, and each of them:

1.    The Court will retain jurisdiction to determine the allowability and payment of any claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtor or by any other party in interest entitled to proceed in that matter. As part of such retained jurisdiction, the Court will continue to determine the allowability of Administrative Claims and any request(s) for payment(s) thereof, including professional fees and costs which are Administrative Claims.

2.    The Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision(s) of this Plan.

3.    The Court will retain jurisdiction to facilitate the consummation of this Plan by entering, consistent with the provisions of this Plan, any further necessary or appropriate order(s) regarding the enforcement of this Plan and any provision(s) thereof.

4.    This Court will retain jurisdiction to adjudicate any cause(s) of action or other proceeding(s) presently pending or otherwise referenced here or elsewhere in this Plan, including, but not limited to, the adjudication of any and all "core proceedings" under 28 U.S.C. § 157(b), which may be pertinent to this Reorganization Case, and which the Debtor may deem it appropriate to initiate and prosecute in aid of its reorganization.

5.    The Court will retain jurisdiction to enter an appropriate final decree in this Reorganization Case.

6.    The Court will retain jurisdiction to enter an appropriate final decree, and any

interim order(s), in any adversary proceeding(s) which may be initiated during this Chapter 11 proceeding.

## XIII.   FEASIBILITY OF PLAN

The Debtor believes that the Plan is feasible based on its ability to obtain approximately $170,000,000 in new funding as described above within the next three to six months to provide the needed money to pay Delphi and other allowed secured creditors, administrative and operating expenses, and complete construction of its Project.  This will, in turn, enhance the Project's value and increase ongoing revenue streams to fund additional operations, construction, and pay allowed creditors' claims. Through the Settlement Agreement with Delphi and this Plan, the Debtor reduced Delphi's allowed secured claim by around $60–$70 million, thus freeing up substantial equity in the Debtor's assets with which to fund payments contemplated under this Plan to remaining allowed creditors.

Notably, not only do Reno city officials support the Debtor's proposed Plan, but numerous local businesses and community organizations are in support of the current management team working to turn the Project into a successful and thriving part of downtown Reno.  Such individuals and entities have written letters of support, including the following:

(1) Hillary Schieve, Mayor of the City of Reno;

(2) Neoma Jardon, Executive Director of the Downtown Reno Partnership; and

(3) The Simon Family, owner of the Reno Aces, Park Center Towers and other nearby properties. These city officials and local businesses recognize the impact of the Project on the Reno community, and the detriment to the community if the Project is allowed to languish in an incomplete state or fall victim to the uncertainty of a foreclosure sale. Attached as **Exhibit 9** are copies of the letters of support. These city officials and local businesses recognize the impact of the Project on the Reno community, and the detriment to the community if the Project is allowed to languish in an incomplete state or fall victim to the uncertainty of a foreclosure sale.

The Debtor's proposed Plan provides for a quick construction start on the Project which will not only enhance the value, security, and aesthetics of the Project, but which will also

invigorate the downtown business community and provide significant employment opportunities for Washoe County's residents.

## XIV. LIQUIDATION ANALYSIS

The Debtor is proposing a Plan based on continued business operations to complete development and construction of the Project and then sell, lease, or operate the Project depending on the most beneficial outcome for the Debtor.

The Plan must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the debtor filed a Chapter 7 petition instead.

In a Chapter 7 liquidation case, the general rule is that the Debtor's assets are sold by a trustee. Unsecured creditors share in the proceeds of sale only after secured creditors and administrative claimants are paid. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims. In the present case, a creditor would recover less from the assets of the bankruptcy estates under Chapter 7 than it would under Chapter 11. First, the Debtor's Plan proposes to pay all allowed unsecured creditors in full, with post-petition interest, which is not guaranteed in a Chapter 7 case. Second, in a Chapter 7 case a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5% on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to exceed 3% on any amount over $3,000,000, thus diminishing monies available for payment to unsecured creditors.

Debtor's Plan proposes 100% payment of allowed unsecured claims, with post-petition interest until paid. The Debtor estimates that its allowed creditors will receive substantially more through this Plan than in a chapter 7 liquidation because the gross liquidation value of its assets is difficult to estimate based on the incomplete state of the Project. The current state and size of the Project means that there would be limited interested buyers. Because the Debtor has no current liquid assets, a trustee could not pay ongoing utilities, property taxes, insurance, and security

36

expenses to maintain the Project during any reasonable marketing period. Accordingly, a chapter 7 trustee would most likely have to conduct a fire-sale liquidation of the Project which would likely not pay all secured creditors, and unsecured creditors would receive nothing. The other alternative would be for a chapter 7 trustee to allow Delphi to foreclose on the Project, also resulting in no payment to junior secured creditors or unsecured creditors.

## XV.    **DISCLOSURE STATEMENT**

When the Debtor solicits the requisite acceptance(s) of this Plan, it will be accompanied by a Disclosure Statement that will have been approved, or conditionally approved, by the Court, as amended, prior to such solicitation.  The Debtor requests that all parties whose acceptance(s) of this Plan are solicited should direct their attention to the Disclosure Statement.

## XVI.    **CONFIRMATION REQUEST**

The Debtor requests that the Court confirm the Plan in accordance with the provisions of Section 1129(a) and/or Section 1129(b) of the Bankruptcy Code.

DATED this 1st day of November, 2024.

FLETCHER & LEE

/s/ Elizabeth Fletcher, Esq.
ELIZABETH FLETCHER, ESQ.


HARRIS LAW PRACTICE LLC

/s/ Norma Guariglia, Esq.
NORMA GUARIGLIA, ESQ.

<u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. Civ. P. 5(b), I certify under penalty of perjury that I am an employee of Fletcher & Lee, 448 Ridge Street, Reno, Nevada 89501, and that on November 1, 2024, I served the <u>Second Amended Plan of Reorganization</u> by ECF to all those persons registered with the United States Bankruptcy Court for electronic notice in this matter as follows:

SETH J. ADAMS on behalf of Creditor J.W. McClenahan Co.
sadams@woodburnandwedge.com, mpuletau@woodburnandwedge.com

ETHAN J. BIRNBERG on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
birnberg@portersimon.com, kdwyer@portersimon.com

LOUIS M BUBALA, III on behalf of Interested Party PKWY MANAGEMENT, LLC
lbubala@kcnvlaw.com, cdroessler@kcnvlaw.com;kmilks@kcnvlaw.com

CHAPTER 11 - RN
USTPRegion17.RE.ECF@usdoj.gov

KEVIN A. DARBY on behalf of Creditor JUST FLOOR IT!
kevin@darbylawpractice.com,
tricia@darbylawpractice.com;mandie@darbylawpractice.com;makayla@darbylawpractice.com;atley@darbylawpractice.com

BRIAN L. DAVIDOFF on behalf of Creditor BRISTLECONE MANAGEMENT LLC
bdavidoff@greenbergglusker.com,
calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com

BRIAN L. DAVIDOFF on behalf of Creditor CHRISTOPHER BEAVOR
bdavidoff@greenbergglusker.com,
calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com

ELIZABETH A. FLETCHER on behalf of Debtor RENO CITY CENTER OWNER LLC
efletcher@fletcherlawgroup.com,
edendary@fletcherlawgroup.com;epaulson@fletcherlawgroup.com

NORMA GUARIGLIA on behalf of Debtor RENO CITY CENTER OWNER LLC
norma@harrislawreno.com, hannah@harrislawreno.com;steve@harrislawreno.com

DANIEL M. HANSEN on behalf of Creditor ARMAC CONSTRUCTION, LLC
dhansen@gibbsgiden.com, sberry@gibbsgiden.com

STEPHEN R HARRIS on behalf of Debtor RENO CITY CENTER OWNER LLC
steve@harrislawreno.com, hannah@harrislawreno.com;norma@harrislawreno.com

JEFFREY L HARTMAN on behalf of Creditor BRISTLECONE MANAGEMENT LLC
notices@bankruptcyreno.com, abg@bankruptcyreno.com

JEFFREY L HARTMAN on behalf of Creditor CHRISTOPHER BEAVOR
notices@bankruptcyreno.com, abg@bankruptcyreno.com

1    CARLOS R. HERNANDEZ-VIVONI on behalf of U.S. Trustee U.S. TRUSTEE - RN - 11
     carlos.hernandez-vivoni@usdoj.gov
2
     RICK R. HSU on behalf of Creditor Nelson Wilcox Structural Engineers, PC
3    rhsu@mclrenolaw.com, hmotta@mcllawfirm.com

4    H STAN JOHNSON on behalf of Creditor Luxe Industries, LLC
     sjohnson@cohenjohnson.com,
5    calendar@cohenjohnson.com;sgondek@cohenjohnson.com;johnson.stanb122622@notify.bestca
     se.com;johnson.stanb122622@notify-prod.bestcase.com
6
     TIMOTHY A LUKAS on behalf of Creditor Delphi CRE Funding LLC
7    ecflukast@hollandhart.com

8    EDWARD M. MCDONALD on behalf of U.S. Trustee U.S. TRUSTEE - RN - 11
     edward.m.mcdonald@usdoj.gov
9
     STEFANIE T. SHARP on behalf of Creditor TK Elevator Corporation (fka Thyssenkrupp
10   Elevator Corporation (fka Thyssenkrupp Elevator Corporation)
     ssharp@rssblaw.com, chernandez@rssblaw.com
11
     JEFFREY S. SPENCER on behalf of Creditor Intermountain Electric, Inc.
12   jeff@sslawnv.com, paralegals@sslawnv.com

13   JEFFREY S. SPENCER on behalf of Creditor National Ceramic Tile & Stone
     jeff@sslawnv.com, paralegals@sslawnv.com
14
     U.S. TRUSTEE - RN - 11
15   USTPRegion17.RE.ECF@usdoj.gov

16   JOSEPH G. WENT on behalf of Creditor Delphi CRE Funding LLC
     jgwent@hollandhart.com, vlarsen@hollandhart.com;IntakeTeam@hollandhart.com
17
     JOSEPH G. WENT on behalf of Defendant DELPHI CRE FUNDING, LLC
18   jgwent@hollandhart.com, vlarsen@hollandhart.com;IntakeTeam@hollandhart.com

19   RYAN J. WORKS on behalf of Creditor WESTERN PARTITIONS, INC.
     rworks@mcdonaldcarano.com, kkirn@mcdonaldcarano.com;bgrubb@mcdonaldcarano.com
20
     RYAN J. WORKS on behalf of Plaintiff MT. ROSE HEATING AND AIR CONDITIONING,
21   INC., A NEVADA CORPORATION
     rworks@mcdonaldcarano.com, kkirn@mcdonaldcarano.com;bgrubb@mcdonaldcarano.com
22
     RYAN J. WORKS on behalf of Plaintiff WESTERN PARTITIONS, INC., A FOREIGN
23   CORPORATION
     rworks@mcdonaldcarano.com, kkirn@mcdonaldcarano.com;bgrubb@mcdonaldcarano.com
24
     NATHAN R. ZELTZER on behalf of Creditor Anchor Door Installs, LLC
25   nrzbk@yahoo.com, nrzbk1@gmail.com;TheLawOfficeofNathanRZeltzer@jubileebk.net

26        DATED this 1st day of November, 2024.

27                                          /s/ Elizabeth Dendary, ACP
                                            ELIZABETH DENDARY, ACP
28                                          Advanced Certified Paralegal

                                   39

# EXHIBIT 1

# EXHIBIT 1

| Creditor Name | Scheduled Amount | Consideration | Proof of Claim # | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|---|---|
| 1-888-4-Abatement NV, Inc. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| 777 Satellite Star | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| ACCO Engineered Systems | $43,871.58 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Acme Construction Supply Co., Inc. | $22,678.78 | | None | $0.00 | $0.00 |
| Advance Installations, Inc. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| AFCO Insurance | $64,938.19 | Services | None | $0.00 | $0.00 |
| American Drywall Service LLC | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Anchor Door Installs, LLC | $137,266.95 | Suppliers or Vendors | Claim 16 | $144,491.00 | $137,266.45 |
| Apartments LLC | $17,500.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| ARC Workplace Services | $8,517.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Arizona Tile | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Armac Construction | $0.00 | Suppliers or Vendors | Claim 12 | $14,767.59 | Unknown |
| BERKADIA | $0.00 | Suppliers or Vendors | None | $0.00 | |
| Berkshire Hathaway GUARD Insurance Company | None | | Claim 28 | $6,780.00 | Unknown |
| Best Hardwood Flooring & Tile | $41,569.80 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Big Iron Inc. | $862.50 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Black & Wadhams | $25,989.50 | Services | None | $0.00 | $0.00 |
| Black Eagle Consulting, Inc. | $13,002.50 | Suppliers or Vendors | Claim 23 | $13,002.50 | $13,002.50 |
| Bonanza Produce Co. | $2,185.01 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Booking.com | $3,598.20 | Services | None | $0.00 | $0.00 |
| Bradley G. Mullins | $4,697.00 | Services | None | $0.00 | $0.00 |
| Brady Companies, LLC | $8,145.62 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Bramco Construction Corporation | $16,559.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| BrandSafway Services LLC | $1,539.12 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Budget Blinds | $1,200.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| CA Generator Service | $5,310.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Cameron Ashley Building Products | $9,961.71 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Campbell's Carpets of Nevada | $5,562.50 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Certified Access | $43,710.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| ClearCapital.com, Inc. | None | | Claim 27 | $2,673,699.00 | Disputed |
| Cloud Tech LLC | $35,500.00 | Suppliers or Vendors | Claim 53 | $35,500.00 | Unknown |
| Commercial Systems | $40,750.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Concrete Resurfacing Systems | None | | Amended Claim 32 | | |
| Construction Reality Capture, LLC dba Multivista | $1,800.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Construction Specialties, Inc. | $11,325.33 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Contract Flooring & Interior Services, Inc. | $3,348.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| CWaluA | $344.24 | Suppliers or Vendors | None | $0.00 | $0.00 |

| Creditor Name | Scheduled Amount | Consideration | Proof of Claim # | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|---|---|
| D&D Roofing | $3,850.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Dal Tile | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Daniel Brown | None | | Claim 30 | $91,793.00 | Unknown |
| Delta Fire Systems, Inc. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Desert Fire Protection L.P | $1,200.00 | Suppliers or Vendors | Claim 25 | $20,568.14 | $0.00 |
| Diamond Concrete Cutting | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Dickinson Wright PLLC | $159.00 | Services | None | $0.00 | $0.00 |
| Dish Network LLC | $0.00 | Cable / Satellite Services | None | $0.00 | $0.00 |
| Dos Bandidos, LLC | $16,000.00 | | None | $0.00 | $0.00 |
| Doyle K. Damron (Allegiance West) | $5,700.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| E&A Contracting | $85,964.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| E3 Design Group | $430.19 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Ecolab Pest Elimination Division | $2,585.01 | Services | None | $0.00 | $0.00 |
| Ecolab USA Inc. | $12,009.65 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Eide Bailly LLP | $6,033.00 | Services | None | $0.00 | $0.00 |
| Emcor Services | $60,146.67 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Emerald Textile Services, Reno, LLC | $45,116.00 | Suppliers or Vendors | Claim 13 | $842,020.39 | $68,357.33 |
| EPC-Electrical Professional Consultants | $1,740.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| EquipmentShare | $194,569.43 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Expedia, Inc. | $17,262.22 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Express Services | $1,328.94 | Suppliers or Vendors | None | $0.00 | $0.00 |
| F3 & Associates | $1,780.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Fabtech, LLC | $1,085.50 | Suppliers or Vendors | None | $0.00 | $0.00 |
| FEA Consulting Engineers | $395.96 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Fedex Freight | $207.00 | Services | None | $0.00 | $0.00 |
| Felger & Associates | $1,000.00 | Services | None | $0.00 | $0.00 |
| Fennemore Craig, P.C. | $19,392.50 | Services | None | $0.00 | $0.00 |
| Ficcadenti Waggoner and Castle Structural Engineers, Inc. | $4,646.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Fitzgerald Virginia & Plaza LLC | None | | Claims 33 and 34 | $470,323.78 | Disputed |
| Floor & Decor Commercial | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| FSI / Flooring Solutions of NV, Inc | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Gannett Satellite Network Inc. | $1,669.50 | Cable / Satellite Services | None | $0.00 | $0.00 |
| Golden Entertainment | $80,000.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Grainger, Inc. | $27,160.96 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Green Solutions Recycling | $2,256.38 | Services | None | $0.00 | $0.00 |
| HCVT (Holthouse Carlin & Van Trigt LLP) | $1,910.00 | Services | None | $0.00 | $0.00 |

| Creditor Name | Scheduled Amount | Consideration | Proof of Claim # | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|---|---|
| Hejmanowski & McCrea LLC | $10,736.86 | Services | None | $0.00 | $0.00 |
| Helix Electric | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Henri Specialties Co., Inc. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| High Mountain Door & Trim, INC. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Home Depot Credit Services | $5,713.14 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Hootsuite Inc | $3,939.94 | Services | None | $0.00 | $0.00 |
| Horizon Window Fashions LLC | $26,966.81 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Hoy Chrissinger Vallas, PC | $7,937.00 | Services | Claim 1 | $8,722.79 Disputed | |
| IC-AC Harvard, LLC | $45,668.75 | | None | $0.00 | $0.00 |
| ICS Tax, LLC | $26,405.20 | Services | None | $0.00 | $0.00 |
| Indovance Inc. | $9,000.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Industrial Handling Equipment, Inc. | $9,057.83 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Innovative Cabinets & Design | $10,841.50 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Interior Specialists | $366,342.80 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Iron Dragon Fabrication LLC | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Ironclad Builders LLC (Big Iron) | $575.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Jive Communications, Inc | $34,763.84 | Telephone / Internet services | None | $0.00 | $0.00 |
| JL Digital LLC | $207,697.95 | Suppliers or Vendors | Claim 52 | $207,697.95 | $155,250.98 |
| Johnson Controls Fire Protection LP | None | Suppliers or Vendors | Claim 29 | $226,509.46 Disputed as to amount | |
| JP Cabinet Sales | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Just Floor It! | $69,731.33 | Suppliers or Vendors | Claim 20 | $135,999.49 | $0.00 |
| Kodama, LLC. | $5,760.00 | Suppliers or Vendors | Claim 37 | $5,940.00 | $5,049.00 |
| Kristina Stanley | $185.95 | Services | None | $0.00 | $0.00 |
| Kyla Alisna | $5,090.55 | Services | None | $0.00 | $0.00 |
| Lewis Roca Rothgerber Christie, LLP | $2,977.80 | Services | None | $0.00 | $0.00 |
| Life Pillars, LLC | $6,000.00 | | None | $0.00 | $0.00 |
| McGinley & Associates | $10,819.00 | Services | None | $0.00 | $0.00 |
| Mobile Mini | $165,924.50 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Moran Reeves & Conn PC | $27,733.00 | Services | None | $0.00 | $0.00 |
| Mountain Alarm / Burgarello Alarm | $945.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| MSE Environmental | $9,500.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Natco Company LLC | $52,734.51 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Neeser Construction | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Nevada Recycling & Salvage, LLC | $44,865.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Nevada Recycling & Salvage, LLC | $11,050.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| New Rome (OSA Consultant) | $0.00 | Services | None | $0.00 | $0.00 |
| New West Distributing | $1,440.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Northern Nevada Public Health | $935.00 | Services | None | $0.00 | $0.00 |

| Creditor Name | Scheduled Amount | Consideration | Proof of Claim # | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|---|---|
| NV Energy | $2,118.93 | Utility Services | None | $0.00 | $0.00 |
| Obermeier Sheykhet Architecture | $41,760.16 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Occupational Health Centers of the Southwest, P.A. | $281.00 | Services | None | $0.00 | $0.00 |
| Orbis Solutions, Inc. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Paladin Risk Management LTD LLC | $3,000.00 | Services | None | $0.00 | $0.00 |
| Partition King | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Penguin Mailboxes | $0.00 | Services | None | $0.00 | $0.00 |
| Penhall Company | $6,122.42 | Services | None | $0.00 | $0.00 |
| Phillip Jeffries Ltd | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| PKWY Management, LLC | $946,090.35 | Tenant Improvements reimbursement | Claim 57 | $7,477,433.81 | Unknown (*NOTE - claimant has agreed to payment on different terms contingent on the confirmation of the Second Amended Plan. |
| Premier Office Systems | $437.63 | Suppliers or Vendors | None | $0.00 | $0.00 |
| ProCabinet Solutions/Quadro Cabinets | $45,418.37 | Suppliers or Vendors | Claim 19 | $56,582.82 | $45,418.37 |
| Quality Countertops and Design, Inc. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Quality Plumbing Supply | $285.75 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Quick Space | $173,545.75 | Suppliers or Vendors | Claim 24 | $312,931.88 | $0.00 |
| R&B Wholesale Distributors, Inc. | $4,006.29 | Suppliers or Vendors | None | $0.00 | $0.00 |
| R.F. MacDonald Co. | $65,995.25 | Suppliers or Vendors | None | $0.00 | $0.00 |
| RealPage, Inc. | $68,405.16 | Services | None | $0.00 | $0.00 |
| Renaissance Life & Health Insurance Company of America | $2,989.50 | Services | None | $0.00 | $0.00 |
| Reno Carson Lumber | $5,308.62 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Reno Paint Mart | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Rent Group Inc | $12,259.50 | Services | None | $0.00 | $0.00 |
| RHP Mechanical Systems | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Rick's AEC Reprographics | $1,743.45 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Risk Placement Services, Inc. | $19,821.01 | Services | None | $0.00 | $0.00 |
| Schindler Elevator Corporation | $8,974.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| ServiceMaster First Response | $28,355.96 | Suppliers or Vendors | None | $0.00 | $0.00 |
| SGF Engineering | $48,466.90 | Suppliers or Vendors | Claim 14 | $58,286.55 | $48,466.30 |
| Sherwin Williams | $3,056.79 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Sierra Pacific Power Company | $23,111.34 | Utility Services | None | $0.00 | $0.00 |
| Signs by Tomorrow | $336.79 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Signtech Electrical Advertising, Inc. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Silver Legacy Resort & Casino | $26,923.36 | | None | $0.00 | $0.00 |

| Creditor Name | Scheduled Amount | Consideration | Proof of Claim # | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|---|---|
| Silver State Barricade & Sign | $44,876.79 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Sky Fiber | $0.00 | Telephone / Internet services | None | $0.00 | $0.00 |
| Sorensen Entity Services, LLC | $3,474.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Southwest Specialty Contractors, LLC | $189,346.60 | Suppliers or Vendors | Claim 22 | $189,346.00 | $160,944.10 |
| State of Nevada Mechanical Compliance Division | $15,000.00 | Services | None | $0.00 | $0.00 |
| State of Nevada Department of Taxation | $0.00 | Unpaid MBT Taxes | Claim 2 | $531.80 | $531.80 |
| Statewide Lighting Inc. | $25,242.94 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Stericycle, Inc. | $1,071.29 | Services | None | $0.00 | $0.00 |
| Sunbelt Rentals | $38,249.36 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Supreme Concrete LLC | $49,201.60 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Sysco Guest Supply, LLC | $547.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Sysco Sacramento Inc. | $25.62 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Tahoe Supply Company | $405.86 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Tenaska Power Services Co | $78,759.75 | Utility Services | None | $0.00 | $0.00 |
| Tholl Fence | $10,094.62 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Thomas Precision Welding | $6,240.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| TK Elevator Corporation | None | | Claim 36 | $653,202.00 | Disputed as to amount |
| Travelscape LLC | $12,000.00 | Services | None | $0.00 | $0.00 |
| Truckee Meadows Water Authority | $2,542.42 | Utility Services | None | $0.00 | $0.00 |
| United Rentals | $43,841.41 | Suppliers or Vendors | None | $0.00 | $0.00 |
| United Rentals (Heaters) | $2,855.05 | Suppliers or Vendors | None | $0.00 | $0.00 |
| United Site Services | $25,028.84 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Utility Telecom | $13,737.30 | Telephone / Internet services | None | $0.00 | $0.00 |
| Virtual Business Enterprises, LLC | $3,000.00 | Services | None | $0.00 | $0.00 |
| WAC Lighting | $2,868.27 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Waste Management | $8,409.92 | Utility Services | None | $0.00 | $0.00 |
| Wedco, Inc. | $28,866.60 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Western Electricity Coordinating Council | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Western Electricity Coordinating Council | $550.00 | Utility Services | None | $0.00 | $0.00 |
| Western Nevada Supply | $748.30 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Westguard Insurance Company | $8,534.48 | Services | None | $0.00 | $0.00 |
| WGC (Moser contracted) | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Whitney Peak Hotel, LLC | $83,500.00 | | None | $0.00 | $0.00 |
| Wise Consulting and Training | $5,359.00 | Services | None | $0.00 | $0.00 |
| Xclusive Staffing Acquisition Holdings, LLC | $18,000.00 | Services | None | $0.00 | $0.00 |
| Xerox Financial Services | $1,544.68 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Yes Tile LLC. | $0.00 | Suppliers or Vendors | None | $0.00 | $0.00 |
| Scheduled Total: | $4,611,404.08 | | | Total Allowed Amounts: | $634,286.83 |

Page 5 of 5

# EXHIBIT 2

# EXHIBIT 2



**October 27, 2024**

Reno City Center **–** Financing

**RE: Bridge Lender regarding DPO of Senior Loan**

Dear RCCO,

This letter is to inform you we have been engaged to secure bridge financing as it relates to the Discounted Payoff Loan settlement surrounding the Reno City Center Project.   This project consists of multiple phases and multiple asset classes.

We are in receipt of all the necessary due diligence information and are currently in the market to secure a bridge loan for the purpose of satisfying the necessary capital to pay off the Discounted Loan Payoff (DPO) and secured liens.

The current lender interest is meaningful as we have multiple potential lenders currently underwriting the loan. We expect to have the financing in place to make all necessary payments by Dec. 31st, 2024.   We anticipate having a formal loan commitment no later than Dec. 1st,2024.

We continue to receive and answer questions as it relates to the redevelopment and are working closely with each potential lender to satisfy any concerns.

Please let me know if I can provide any additional commentary.

Sincerely,

Grant Lammersen
Vice Chair **–** Western U.S. Capital Markets
Grant.lammersen@colliers.com

# EXHIBIT 3

# EXHIBIT 3

## SECOND AMENDMENT TO LEASE AGREEMENT

**THIS SECOND AMENDMENT TO LEASE AGREEMENT** ("Second Amendment") is entered into and effective as of the 2nd day of September, 2024 (the "Effective Date") by and between **RENO CITY CENTER OWNER LLC**, a Delaware limited liability company ("Landlord"), **RENO CITY CENTER, LLC**, a Nevada limited liability company ("Initial Landlord"), and **PKWY MANAGEMENT LLC**, a Nevada limited liability company ("Tenant").

### RECITALS

A.      Landlord and Tenant are parties to that certain Lease Agreement, dated September 3, 2021 ("Lease Agreement"), for certain leased premises containing approximately 15,459 square feet for Tenant' use, as more particularly described in the Lease Agreement, as amended by that certain First Amendment to Lease Agreement, dated March 21, 2022 ("First Amendment" and together with the Lease Agreement, collectively, the "Lease"), both of which were executed by Initial Landlord.

B.      In May 2022 as part of the process of obtaining the current construction loan, Initial Landlord transferred title to the real property that included the Premises to Landlord, and Landlord was assigned and assumed all rights and obligations under the Lease.

C.      Tenant, rather than Landlord, has undertaken the construction of the Tenant Improvements, and Tenant has also undertaken additional work, outside the Premises for the benefit of Landlord.

D.      On February 16, 2024, Landlord filed a voluntary Chapter 11 Bankruptcy Petition in the United States Bankruptcy Court for the District of Nevada, styled as Case Number 24-50152 (the "Bankruptcy").

E.      Landlord and Tenant now desire to amend the Lease as hereinafter set forth and Initial Landlord desires to guarantee Landlord's obligations under the Lease as modified hereby.

### AMENDMENT

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Definitions. Any capitalized terms used in this Second Amendment and not defined herein shall have the meanings ascribed thereto in the Lease.

2.    <u>Bankruptcy</u>.    Promptly after the Effective Date, Landlord shall use all commercially reasonable efforts to obtain approval from the Court in the Bankruptcy with respect to this Second Amendment.

3.    <u>Additional Square Footage</u>. The parties hereby agree that the Premises shall be that certain crosshatched area on the Site Plan attached hereto as <u>Exhibit A</u>, with a Floor Area of 21,295 square feet, of which 18,337 SF is primary space and 2,958 SF is basement space. The Property also includes a 1,270 SF patio.

4.    <u>Rent</u>. The parties hereby agree that the Minimum Annual Rent shall be:

| Year of Lease Term | Minimum Monthly Rental | Minimum Annual Rental | Annual Rental Rate Per Square Foot |
|---|---|---|---|
| 1 – 5<br>Basement<br>**Total** | $ 45,842.50<br>$   4,930.00<br>**$ 50,772.50** | $ 550,110.00<br>$   59,160.00<br>**$ 609,270.00** | $ 30.00<br>$ 20.00 |
| 6 – 10<br>Basement<br>**Total** | $ 50,426.75<br>$   5,423.00<br>**$ 53,311.13** | $ 605,121.00<br>$   65,076.00<br>**$ 670,197.00** | $ 33.00<br>$ 22.00 |
| 11 – 12<br>Basement<br>**Total** | $ 55,469.43<br>$   5,965.30<br>**$ 61,434.73** | $ 665,633.10<br>$   71,583.60<br>**$ 737,216.70** | $ 36.30<br>$ 24.20 |
| 13 – 17*<br>Basement<br>**Total** | $ 55,469.43<br>$   5,965.30<br>**$ 61,434.73** | $ 665,633.10<br>$   71,583.60<br>**$ 737,216.70** | $ 36.30<br>$ 24.20 |
| 18 - 22*<br>Basement<br>**Total** | $ 61,016.37<br>$   6,561.83<br>**$ 67,578.20** | $ 732,196.41<br>$   78,741.96<br>**$ 810,938.37** | $ 39.93<br>$ 26.62 |
| *If Applicable | | | |

5.    <u>Deletion of Sentence in Section 4.A</u>.  The fourth (4th) sentence of Section 4.A is hereby deleted in its entirety.  That sentence stated, "In the event Minimum Annual Rental has not commenced within three (3) years from the Date of this Lease, then this Lease shall automatically terminate and Landlord and Tenant shall each be released from any further obligations under this Lease."

6.    <u>Permit Contingency</u>. The parties acknowledge and agree that Tenant has waived the permit contingency set forth in Article 4B of the Lease.

7.    <u>Commencement Date</u>. The Commencement Date of the Lease shall be revised to be the date that is thirty (30) days after (i) Tenant receives a certificate of occupancy or temporary certificate of occupancy for the Premises; (ii) Landlord has completed its work in the Shopping Center so that Tenant's employees and customers have use of all parking

lots, sidewalks and common areas which are reasonably necessary for the use and enjoyment of the Premises without unreasonable interference, and (iii) either (x) the exterior of the Shopping Center is finished and obviously open for business and does not appear to Tenant's customers to be under construction, or (y) ten percent (10%) of both the office space and residential units are leased and occupied by paying, market-rate tenants. Notwithstanding the foregoing, Tenant shall pay 30% of Base Rent in the event that: (a) Tenant receives its certificate of occupancy and opens for business to the public on a regular basis; and (b) Landlord will have available at minimum 260 parking spaces with permit allowing use which may include parking spaces owned or leased by landlord..

8.    <u>Landlord's Contribution</u>.    Tenant has assumed Landlord's obligation for installation of the Tenant Improvements, has entered into a construction contract with a contractor for the same, and has to date spent well in excess of the Landlord's Contribution amount towards such Tenant Improvements. The amount of Landlord's Contribution shall be $35.00 per square foot of primary space and basement space, estimated to be 18,337 square feet and 2,958 square feet respectively. Tenant's contractor has provided Landlord with pay application certification of spending in excess of the Landlord's Contribution.  Landlord's contribution shall be paid to Tenant within thirty (30) days hereof, subject to any restrictions on that payment being made during the pendency of any bankruptcy petition or adverse proceeding for Landlord enforced by the bankruptcy court.

9.    <u>Tenant Shopping Center Work</u>. At Landlord's request, Tenant agreed to provide certain ductwork and HVACs as well as remove existing flooring and ceilings from portions of the Shopping Center which are outside the Premises, inclusive of ancillary work and administrations therefore, concurrently with the construction of the remaining Tenant Improvements, at a total cost of $773,962.56, subject to any additional change orders ("<u>Tenant's Shopping Center Work Cost</u>").  Landlord shall pay Tenant's Shopping Center Work Cost in full upon presentation of an application of payment therefor from Tenant accompanied by appropriate lien releases for such work, subject to any restrictions on that payment being made during the pendency of any bankruptcy petition or adverse proceeding for Landlord enforced by the bankruptcy court.

10.    <u>Brokers</u>.    Neither party is represented by Brokers and no additional leasing commissions will be paid in connection with this lease Amendment.

11.    <u>Landlord's Notice Address</u>.  The Landlord's notice address shall be changed to: Reno City Center Owner LLC, 339 W State Street, Suite 201, Eagle ID 83616; with copy to Gunderson Law Firm, 3895 Warren Way, Reno NV 89509.

12.    <u>Miscellaneous</u>.  Except as specifically modified and amended herein, all terms, provisions, conditions, and exhibits contained in the Lease are hereby reinstated, confirmed, ratified, and shall remain unmodified and in full force and effect.  In the event of any inconsistencies between this Second Amendment and the Lease, the terms of this Second Amendment shall govern and control. This Second Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

13.    <u>Counterparts</u>.    This Second Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same agreement, and any signature may be made electronically (including pdf or any electronic signature complying with the United States federal ESIGN Act of 2000, e.g., www.docusign.com), and any such electronic signature shall be deemed to be valid and effective for all purposes.

To indicate their consent to this Second Amendment, the parties or their authorized agents or officers have signed this Second Amendment.

[*Signature Page to follow*]

*[Signature Page for Second Amendment to Lease Agreement]*

IN WITNESS WHEREOF, Landlord and Tenant have executed this Second Amendment as of the date first above written.

**LANDLORD:**                                    **TENANT:**

**RENO CITY CENTER OWNER, LLC,**        **PKWY MANAGEMENT LLC,**
a Delaware limited liability company        a Nevada limited liability company

By:     Reno City Mezzanine Borrower, LLC,      By: _Jonathan Fine_____
        a Delaware limited liability company,
        its Sole Member                                Jonathan Fine, Manager

By:     Reno City Center, LLC,
        a Nevada limited liability company,
        its Sole Member

By:     RCC Manager, LLC,
        an Idaho limited liability company,
        its Manager

By:     GPWM QOF Manager, LLC,
        an Idaho limited liability company,
        its Manager

By:     _Philip Oleson_____
        Kirk Walton or Philip Oleson, Manager

**INITIAL LANDLORD:**

**RENO CITY CENTER, LLC**,
a Nevada limited liability company,

By:    RCC Manager, LLC,
       an Idaho limited liability company,
       its Manager

By:    GPWM QOF Manager, LLC,
       an Idaho limited liability company,
       its Manager

By:    *Philip Oleson*
       Kirk Walton or Philip Oleson, Manager

**EXHIBIT A**



Exhibit



Exhibit

# EXHIBIT 4

# EXHIBIT 4

**RENO CITY CENTER | Deveopment Budget**

| DEVELOPMENT BUDGET | REVISED BUDGET | COSTS TO COMPLETE | % Complete |
|---|---|---|---|
| Acquisition Cost | $43,104,840 | $0 | 100.0% |
| Parking Garage | $7,623,900 | $3,123,900 | 59.0% |
| Extended stay hotel - 169 rooms | $41,476,600 | $8,751,600 | 78.9% |
| Hotel Flagged 170 Rooms + 24 suites | $33,035,650 | $23,335,650 | 29.4% |
| Hotel Block Retail/Grocery spaces | $4,088,565 | $925,265 | 77.4% |
| Hotel Block Retail /Grocery- Core/Shell Improvements | $1,959,633 | $1,959,633 | 0.0% |
| Hotel Block 2nd Floor Retail | $1,787,398 | $404,498 | 77.4% |
| Hotel Block 2nd Floor Retail - Core/Shell Improvements | $1,921,491 | $1,921,491 | 0.0% |
| Hotel Block Retail /Grocery- Exterior Façade Improvements | $1,755,000 | $1,755,000 | 0.0% |
| Plaza Land | $855,000 | $0 | 100.0% |
| MF Block Retail | $4,006,700 | $0 | 100.0% |
| MF Block Retail - 1st Floor Core/Shell Improvements | $2,405,169 | $2,405,169 | 0.0% |
| MF Block Office - 2nd floor South Office Spaces | $323,066 | $323,066 | 0.0% |
| MF Block Office - 2nd Floor Core/Shell Improvements | $1,685,034 | $1,685,034 | 0.0% |
| MF Block Office - 3rd floor South Office Spaces | $192,933 | $192,933 | 0.0% |
| MF Block Office - 3rd Floor Core/Shell Improvements | $782,496 | $782,496 | 0.0% |
| MF Block Office - 4th floor South Office Spaces | $298,087 | $298,087 | 0.0% |
| MF Block Office - 4th Floor Core/Shell Improvements | $1,197,378 | $1,197,378 | 0.0% |
| MF Block Retail - Exterior Façade Improvements | $2,925,000 | $2,925,000 | 0.0% |
| MF North Tower - 172 rooms | $63,124,000 | $20,124,000 | 68.1% |
| Amenity Floor | $9,974,790 | $7,850,115 | 21.3% |
| South Tower Office TI | $23,045,000 | $10,530,000 | 54.3% |
| Theater | $3,444,208 | $2,413,008 | 29.9% |
| MF Block Office | $5,095,420 | Included above | |
| Bank Building Office | $1,753,100 | Included above | |
| Plaza Retail/Lanscaping | $6,140,277 | $6,140,277 | 0.0% |
| Heating Water/Chilled Water Systems Upgrades | $2,925,000 | $2,925,000 | 0.0% |
| Common Area/Back of House/Demising | $8,180 | Included above | |

| | | |
|---|---|---|
| Contingency | $8,157,488 | $8,157,488 | 0.0% |
| **Gross Total Cost (2)** | **$275,091,404** | **$110,126,089** | **60.0%** |
| Senior Loan Write-down | ($49,421,000) | | |
| **Net Total Cost (2)** | **$225,670,404** | | |
| Stabilized NOI | $18,966,430 | $18,966,430 | |
| **Yield-on-Cost** | **8.40%** | **17.22%** | |

(1) Existing senior loan written down to $50M per agreeemnt with existing lender.
(2) Total cost excluding financing costs.

**TOTAL COSTS FUNDED TO DATE**

| | |
|---|---|
| Acquisiton Cost | $43,104,840 |
| Pre-Dev Costs | $1,246,262 |
| Hard Costs | $61,722,107 |
| Soft Costs | $33,094,546 |
| FF&E | $147,693 |
| Capital Expenditures | $3,949,628 |
| Carry Costs | $13,184,867 |
| Misc Costs | $5,771,057 |
| **Total** | **$162,221,000** |

| | |
|---|---|
| Sponsor Equity Funded | $62,800,000 |
| Debt Funded (1) | $99,421,000 |
| **Total** | **$162,221,000** |

# EXHIBIT 5

# EXHIBIT 5



## NON-BINDING TERM SHEET

5/14/2024

Kirk Walton
GPWM Funds
339 West State Street
Eagle, Idaho, 83616

Dear Kirk:

PACE Equity is pleased to present our proposed terms for your Reno City Center project. Our approach to funding is unique and I encourage you to consider the following as you review the terms outlined below:

- **Our Commitment**. We have completed an initial review of your project with our in-house team of experts to provide you an initial expectation of funding. If you wish to move forward, we will complete an additional detailed analysis based on the documents provided in order to provide a binding commitment for funding. The terms in this term sheet expire 14 days after issuance.
- **Our Experience**. PACE Equity's team has closed and funded more than 200 projects, pioneering many industry "firsts" including C-PACE funding in complex capital stacks with Historic Tax Credits, New Market Tax Credits, TIF and Opportunity Zones.

- **Our Independence**. PACE Equity is a balance sheet lender. Our review process and credit committee is internal to PACE Equity. There is no warehouse line or outside approvals required for credit decisions.

- **Our Energy Engineering Team.** With PACE Equity, no third-party energy engineers or consultants are required. Our experienced in-house engineering team performs the required energy study to maximize the funding amount & amortization term.

- **Our End-to-End Project Management.** We make a complex process simple. The fees we outline below in the Initial Project Summary include items that reflect our comprehensive end-to-end approach. We manage all aspects of the process, so you don't have to.

- **Our Passion for Customers.** Our *4.95 out of 5.0* customer rating shows we care about our customers and their project success. ★★★★★





## DETAILS OF TERMS

| | |
|---|---|
| Construction Funding Amount | **$35,000,000**. PACE Equity will additionally fund our fees, Program Administration fees, legal fees and capitalized interest. |
| Financing Rate | **PACE Equity Financing**<br><br>o The greater of 8.25% or 415 bps + 10-year USTs<br><br>The Financing Rate can change based on adjustments in funding amount, term or prepayment. |
| Term | Our target amortization term is 30 years. |
| Project Development | Our in-house engineering and transactions team will develop your project to deliver the maximum funding amount, the longest amortization term, and all approvals. No third-party energy engineers required. |
| Prepayment | This spread assumes a prepayment penalty of 3% for years 1-5; 2% years 6-10; 1% years 11-15; no penalty thereafter. Other prepayment options are available which may increase or decrease the rate. |
| Capitalized Interest | PACE Equity sets up an interest reserve to cover a period between our funding and the first payment. We have assumed a first payment in May 2026. The interest reserve is capitalized and amortized into our funding balance. We typically fund enough capitalized interest so there are no payments during construction. On a case-by-case basis, we can reduce the reserve amount, so long as there is a reserve for any payments before completion. |
| Initial Funding Review | PACE Equity has proposed funding on an initial review of limited documents. PACE Equity will review a wide variety of due diligence documents in order to confirm funding. This may impact our proposed funding amount. |





## INITIAL PROJECT OVERVIEW

| Funding Summary for GPWM - Reno City Nevada conversion | | | PACE Equity |
|---|---|---|---|
| Direct Construction Costs | $35,000,000 | Pricing Scenario | Standard |
| PACE Equity Prepayment | Years 1-5 3%, 6-10 2%, 11-15 1% | Amortization Term | 30 years |
| Annual Tax Assessment | $3,857,061 | First Payment Date | 5/30/2026 |
| Interest Rate | Greater of 8.25% / 415 bps over 10 yr UST | | |

| Use of Funds | |
|---|---|
| Direct Construction Costs To Be Deposited in Disbursing Account | $35,000,000 |
| Project Development | $150,000 |
| Legal, Broker & Closing Expenses | $690,936 |
| Lender Origination Fee | $410,624 |
| Nevada C-PACE Fee | $75,000 |
| Capitalized Interest | $4,735,867 |
| **Total Amount Financed** | **$41,062,428** |

Key assumptions for funding analysis:

- For redevelopment projects the LTV is limited to 35%, based on stabilized value as determined by a qualified appraiser.
- PACE Equity may increase proceeds during underwriting. This is subject to program LTV limits.
- We finance all costs/expenses associated with our funding.
- Mortgage Lender Consent is required; we will manage the consent process with all participating lenders.

Here are key assumptions and information we used to size your project. We are providing this information so that you can understand what inputs we used which affect our sizing. Please let us know if any of these assumptions are incorrect so that we can adjust our funding as may be needed:

| Project Metrics | | |
|---|---|---|
| NOI - Per Owner/Sponsor | $ | 16,500,000 |
| Assumed Value | $ | 263,000,000 |
| Projected Combined DSCR | | 1.49 |
| PACE Equity LTV | | 15% |
| **Perm. Loan Assumptions** | | |
| Mortgage Amount | $ | 106,000,000 |
| Rate | | 5.75% |
| Amortization | | 30 |

| Target Capital Stack | | | |
|---|---|---|---|
| PACE Equity - Total Assessment | $ | 41,062,428 | 16% |
| Mortgage | $ | 106,000,000 | 41% |
| Equity | $ | 87,000,000 | 34% |
| Lease-Up Income | $ | 22,452,272 | 9% |
| **Total Development Budget** | **$** | **256,514,699** | **100%** |





USE OF FUNDS DESCRIPTION

DIRECT CONSTRUCTION COSTS: cost of building construction

PROJECT DEVELOPMENT: *PACE Equity fees*. PACE Equity uses a process which manages the end-to-end execution of your funding. This fee includes specialized deliverables and approvals required for the transaction including energy engineering and project management. Using our process, we manage all funding and closing requirements, review & approval of the Program Administrator, we boost the project funding potential, and we maximize the amortization term of the financing.

LEGAL & CLOSING EXPENSE:  Legal fees associated with closing.

Lender Origination Fee:  *PACE Equity fees*. Costs associated with capital funding including underwriting, due diligence, transaction management and coordination with the financing team.

PROGRAM ADMINISTRATION FEE:  In order to close, every PACE transaction requires local special improvement district review and approval by a third party.





**END-TO-END PROJECT DEVELOPMENT AND ENERGY ENGINEERING**

PACE Equity uses a unique process to provide end-to-end management of your PACE Equity funding experience. From our initial analysis to the final funding, your experience is simple and straightforward. Because we have in-house engineering expertise to maximize funding and amortization terms, you get the highest funding and term available, with no third-party engineers needed.



If you are ready to move ahead with the terms outlined in this non-binding term sheet, I will prepare a Financing Commitment and Project Development Agreement. This is our binding engagement and commitment to funding your project. We will deliver a seamless, end-to-end execution for your PACE Equity funding. We look forward to working with you.

Regards,

Frank Swain
Managing Director
+1 (202) 441-2265
fswain@pace-equity.com



555 E Wells Street, Ste. 1510  |  Milwaukee, WI 53202  |  855.378.0858  |  LearnMore@PACE-Equity.com

# EXHIBIT 6

# EXHIBIT 6





# EXHIBIT 7

# EXHIBIT 7

October 30, 2024

Elizabeth Fletcher, Esq.
Fletcher & Lee
448 Ridge Street
Reno, Nevada 89501

Re:    Reno City Center Owner – "Harrah's Property"

Dear Ms. Fletcher,

Ahlquist Development LLC ("Ahlquist") is pleased to provide you with this report detailing its retention, involvement, and progress of the development of "Harrah's Property" in downtown Reno, Nevada.

Ahlquist has designed, developed, and constructed more than 3.5 million square feet of mixed-use commercial real estate with a total value of approximately 1.6 billion dollars. Ahlquist's notable projects include Idaho's first TopGolf and other landmark/destination projects such as Ten Mile Crossing, Pioneer Crossing, Eighth & Main, Eagle View Landing, and City Center Plaza. These transformative projects, summarized in a portfolio packet provided contemporaneously herewith, include a strategic mixture of Class-A commercial office space, medical office, retail and restaurant, entertainment, and residential, have revitalized downtown Boise and infused vibrancy into the surrounding Boise metropolitan area.

As a new Profits Interest Owner in the "Harrah's Property", and having been elected by the Owner's members to serve as Manager and Developer for the entire project, Ahlquist has already undertaken the initial steps in its well-defined process that has been successfully implemented and patterned based on a multitude of Ahlquist projects, as outlined herein:

- **Feasibility Study and Analysis**: Ahlquist has toured the subject site on multiple occasions and has initiated a comprehensive feasibility study that analyzes the entirety of the project, with an eye toward identifying the highest and best use of each segmented component of the overall project. In addition, Ahlquist has undertaken an initial study of current market trends and projected revenue streams based on the anticipated blend of uses that will be incorporated into the master development plan. As part of this initial analysis, Ahlquist determines the suitability of each phase of development, evaluates the functionality of the existing space (while considering re-purposing and/or additional tenant improvement build out opportunities), and conducts those types of common due diligence evaluations as may be required when commercial properties are evaluated for financing, including but not limited to, reviewing current and future governmental approvals necessary to permit development, analyzing environmental conditions, evaluating availability and sufficiency of services and

infrastructure, and undertaking a detailed analysis of current and future uses and potential absorption rates based on current and anticipated market conditions.

- **Budget**: As provided herewith, Ahlquist has developed and will continue to refine a budget for the overall project. As the feasibility study and preliminary analysis progresses, Ahlquist will update and refine the budget to account for any additional design, engineering, and contract bidding requirements, and to account for and reflect any alternates selected by the ownership group.

- **Schedule**: Also provided herewith, Ahlquist has developed a master project schedule, which will result in the timely completion of construction of the overall project, and will include an individual schedule for each sub-component of the project (i.e., office, commercial office, retail, hospitality, etc.), all in compliance with the approved budget and consistent with the project's plans and specifications.

- **Entitlements/Condo Plat:** Ahlquist has initiated the process to design and ultimately record a preliminary map that will create individualized condo units for the various components of the project, including for residential, retail, office, and hospitality (including common space for each). Upon approval of the preliminary map, Ahlquist will proceed with final map approval, thereby allowing for cross-collateralization for financing purposes of the individual condo units.

- **General Contractor:** As a profits interest owner, serving in its capacity as Manager and Developer of the project, Ahlquist has selected and contracted with a General Contractor, Engineered Structures, Inc. ("ESI") to provide both pre-construction and construction services for the Harrah's Property project.

To summarize, as it has done on dozens of other projects (totaling 3.5 million square feet of commercial real estate), Ahlquist is setting the foundational building blocks for a successful project. These critical steps, highlighted herein, will ensure the long-term viability of this project, thereby maximizing and accelerating returns for investors, as well as bringing much needed revitalization to downtown Reno.

Sincerely,


J. Thomas Ahlquist

# Downtown Reno Revitalization

AHLQUIST.





Downtown Reno is rewriting its identity, blending its rich history of gaming and entertainment with forward-thinking tech, entrepreneurship, and innovation. The city is becoming a thriving epicenter for opportunity and creativity. The spirit of growth is palpable. A new era is rising.

These two city blocks, formerly the world-famous Harrahs, has been mired in years of uncertainty and bankruptcy. Bringing together an experienced team to lead through the current challenges will be critical to success.

With this in mind, we have assembled a team that has worked together for over twenty years.

Downtown Boise had its own challenges in the early 2000's. In the heart of downtown was the "Boise Hole", a failed development known for multiple pauses and controversy. Literally, a hole filled with weeds and rebar became known as "The Boise Hole". This team transformed this project into a 17-story mixed-use development.

Designed by Darin Bell of Babcock Design Group, built by ESI Construction and Developed by AHLQUIST , 8th and Main became the epicenter of the revitalization of Boise.





Immediately after the completion of 8th and Main, this same team went across the street and developed City Center Plaza, a mixed-use development with an underground public transportation hub, retail, expansion of the convention center, inclusion of the Boise State University Computer Science Department and office for a Boise grown tech company Clearwater Analytics.

In addition to AHLQUIST, ESI, and Babcock Design Group, the Reno Downtown Development Team will include our partner in Elevated Property Company Fred Bruning and his team.

**With a combined experience of over 150 years, this is the premier retail development team in the United States.**

# THE AHLQUIST TEAM

It is ALL about the team! Over the last 20 years, we have assembled professionals driven to deliver results and exceed expectations. Each partner is committed to the foundational VALUES of our company.

ACCONTABLE
INTEGRITY
LEAD BY EXAMPLE
LOYALTY
PASSION
INTEGRITY



**Mark Cleverley**
Chief Leasing Officer



**Brad Smith**
Lead Architect



**Ryan Cleverley**
Chief Operating / Financial Officer



**Tonn Petersen**
Chief Development Officer



**Tommy Ahlquist**
Chief Executive Officer



**Korey Hall**
Chief Construction Officer



# WE BELIEVE...

**words motivate and actions define! The things we say, become the things we do, and in turn create our legacy. For twenty years, together, we have built a legacy that is now AHLQUIST.**

Our origin story is deeply rooted in relationships. Truly understanding the needs of partners and clients has driven our passion and success from day one.

It is all about the team! As we reflect on the projects, it's the people that stand out. We have built a group of driven and tenacious partners at AHLQUIST who defy the odds, work their tails off, and share the passion we have for our community. Our team members have become like family, and we love what we do together.

Hard work and determination have paid off over the years. With more than 3.5 million square feet developed and a total value north of 1.6 billion, Ahlquist Development has shattered expectations. Notable projects include Eagle View Landing (home of Idaho's first TopGolf), Ten Mile Crossing, Pioneer Crossing, Eighth and Main, City Center Plaza, and dozens of other sites and buildings.

At AHLQUIST, the joy is in the process! We create places for people to work and spaces for families to live and play. To us, what's most rewarding about the development process is creating, building, and delivering new projects for communities to thrive in.

AHLQUIST is a full-service development firm ready to meet clients where they are in the development process. From the first call and handshake, our goal is to provide expertise and professional services from the initial vision through move-in.



# TOMMY AHLQUIST
## CHIEF EXECUTIVE OFFICER

Tommy Ahlquist is a visionary who combines a strong work ethic with a keen ability to seize opportunities and turn them into successful ventures. Starting as a teenage entrepreneur, he worked his way through medical school and a residency in emergency medicine while building a career that spanned 18 years in the ER treating over 45,000 patients. Alongside his medical practice, Tommy founded Stat Pads in 2001 to revolutionize defibrillation services, and Ahlquist Development in 2004, which transformed cities across Idaho with its innovative projects.

With more than 3.5 million square feet developed and a total value north of 1.6 billion, AHLQUIST has shattered expectations. Notable projects include Eagle View Landing, home of Idaho's first TopGolf, Ten Mile Crossing, Pioneer Crossing, Eighth and Main, City Center Plaza, and dozens of other sites and buildings.

"I'm often asked what my most memorable project or building is," says Tommy. "My immediate answer is always this: the next one! The joy is in the process! We create places for people to work and spaces for families to live and play. What's most rewarding is creating, building, and delivering new areas for our community to thrive."





# RYAN CLEVERLEY
## CHIEF OPERATIONS/FINANCIAL OFFICER

As the COO of AHLQUIST, Ryan brings an array of experience to the company. While attending Boise State University and earning his Bachelor of Science in Accountancy, he worked for Key Bank gaining a basic understanding of the financial system and its effects on the business world. Upon graduation, Ryan went to work for Arthur Andersen as an auditor working closely with both large public companies and small private companies. This experience would prove valuable to his career and built upon on his finance and accounting base. After leaving the world of public accounting, he jumped into the media business, working for the local NBC affiliate, KTVB Channel 7 in Boise, Idaho. He worked as both the Controller and Human Resources Manager, both of which provided incredible experiences that would enhance both his work and personal life. He also has worked for other companies in similar roles before joining MWI Veterinary Supply, a publicly traded company. In 2013, Ryan joined Gardner Company as the VP of Asset Management, overseeing asset management, property management, human resources, and construction costs, among other areas. He feels that his extensive background across multiple industries and jobs experiences uniquely qualify him to help AHLQUIST become a successful development company.

In his free time, Ryan has dedicated his time to family, God, and community. He enjoys watching his five children alongside his wife, Richelle, participate in various sports and navigate the journey of life. There is nothing more fulfilling than spending time with family while serving others and helping out where he can.



# MARK CLEVERLEY
## CHIEF OPERATIONS/FINANCIAL OFFICER

Mark began his real estate career over 20 years ago when he joined the office brokerage team at Thornton Oliver Keller. He quickly became a trusted advisor and deal maker in many real estate transactions in the Treasure Valley and around the State of Idaho.

Mark joined Gardner Company at a pivotal time in 2014. The commercial real estate portfolio needed some energy and focus as they were growing in the valley. Mark was able to take the portfolio from 75% to 95% leased in just a few years.

Mark was one of the founding partners at AHLQUIST. The portfolio at AHLQUIST is currently at 98% leased on nearly 2.5 million square feet. Mark will not stop until each project becomes a reality. The two key principles that Mark learned growing up and has implemented in his life are hard work and integrity.

Mark enjoys giving back to the community and has served on many different boards over the last 20 years. He loves spending time with his family and has coached each of his kids in basketball, football, soccer and golf. Mark received his associate degree in Accounting from Ricks College and his Bachelor of Business Administration in Accounting and Finance from Boise State University.





# KOREY HALL
## CHIEF CONSTRUCTION OFFICER

Korey grew up on a small farm and ranch in Glenns Ferry, ID. After graduating high school, he attended Boise State University where he earned a Construction Management degree and was a four year starting linebacker on the Boise State Football team. He went on to play professionally with the Green Bay Packers and New Orleans Saints and was part of the 2010 Super Bowl win over the Pittsburgh Steelers. Korey started his construction career in 2012 with Engineered Structures Inc. He acted as a project manager on multiple large commercial projects in the Treasure Valley, including City Center Plaza and BSU Fine Arts.

In 2019 he started with AHLQUIST and has worked to become the Chief Construction Officer of the construction division. Korey is very excited to move forward under the Ahlquist Construction brand and grow the construction team in a fashion that meets the highest of quality and integrity in the industry. He is focused on creating strong partnerships in the industry, with like-minded individuals that are driven to be successful and find solutions on all variety of construction projects. Korey is married to his beautiful wife Jen and has two daughters Josslyn and Leila. They are the anchor and purpose in his relentless pursuit of excellence!





# TONN PETERSEN
## CHIEF DEVELOPMENT OFFICER

Tonn Petersen joined AHLQUIST as Vice President of Development in January 2019. In 2021 Tonn was promoted to Chief Development Officer/Legal Counsel. Tonn oversees all aspects of new development for AHLQUIST, including land acquisition, directing the entitlement process for all new projects, and serving as AHLQUIST's designated government liaison responsible for interfacing and working directly with city and county officials through the annexation, zoning, and platting processes.

Before joining AHLQUIST, Tonn enjoyed a successful career as an attorney working for the Mordall Sperling law firm, New Mexico's largest law firm, and then Perkins Coie, one of the nation's largest law firms. During that time, Tonn specialized in complex commercial litigation. For 13 years he zealously represented Fortune 500 Companies in high stakes, multi-million dollar litigation, including Walmart, Walgreens, Hilton Hotels, and Daimler Chrysler Corporation.

Tonn received a Bachelor's Degree in Finance and Economics from Utah State University in 2001, and a Juris Doctorate Degree from the University of Denver Sturm College of Law in 2005, graduating with honors. The combination of Tonn's extensive legal and business background uniquely qualifies him to drive AHLQUIST's commercial development projects efficiently across the finish line, thereby maximizing overall profitability for investors, partners, and tenants alike.

Tonn, described by his peers as being "fiercely competitive", enjoys participating in an array of outdoor and athletic activities. He lives by a simple mantra – "win each day." He is passionate about coaching youth sports and enjoys spending time with his five boys, always looking for opportunities to instill in them the traits and characteristics that have served as a foundation for his life; namely, a sense of duty, dedication to a cause greater than self, and an unyielding determination.

In his free time Tonn serves as an ecclesiastical leader for his church. But above all, Tonn enjoys spending time with his cherished wife and best friend, Jami.



# BRAD SMITH
## LEAD ARCHITECT

Brad Smith has been practicing in the commercial architecture industry in the Treasure Valley for the past 12 years. He started his career as an AIT with CSHQA after graduating from the University of Idaho with a master's degree in Architecture. In 2012 he joined the team at Babcock Design Group where he resided until he joined the AHLQUIST family in 2018 as their in-house architect.

Through his career, he has been afforded the opportunity to work on several noteworthy projects in the Boise market including the renovation of the Idaho State Capital building, the 8th & Main Building, and City Center Plaza. He has worked on hundreds of structures throughout the country, large and small approaching a billion dollars in constructed projects. Known as one of the kindest guys in the business, Brad brings a strong worth ethic and passion for the industry to the table.

Outside of work, Brad enjoys all of the outdoor activities living in Idaho has to offer. In addition, he loves spending time with his wife Brooke, daughter Vivienne, and dog Lola. His true passion professionally is designing and building things, and he is committed to continuing to help grow the Treasure Valley skyline with AHLQUIST, as well as design projects throughout the West.

# THE ELEVATED PROPERTY CO. TEAM



**Sean Dennison**

Co-President/ Chief Operating Officer



**Chris C. Byers**

Co-President & Chief Revenue Officer



**Fred Bruning**

Chief Executive Officer



Elevated Property Company is the newest, and most experienced, retail and mixed use development company in the InterMountain West. Our senior leadership team, with over 125 years of experience in the industry, has been principally involved in creating some of the most successful and welcoming retail and mixed-use properties in the western United States, including Mountain View Village, Station Park, The Village at Meridian and many other best in class projects.

Each of our projects are designed to elevate the shopping and entertainment experience, and to apply the best practices in the industry to ensure that our tenant mix, environment, architecture, landscaping and public spaces combine to create the finest experiences for our customers, tenants, neighbors and all those who work and play in the communities we serve.





# FRED BRUNING
## CHIEF EXECUTIVE OFFICER

Fred Bruning began his career in the shopping center industry as real estate counsel and territorial real estate director of Sears, during which time he managed Sears real estate portfolio and expansion plans throughout the western United States. Following a successful six years at Sears, he joined several development companies to broaden his development experience, including the Torrance Company, John Price Development Company and the Alexander Haagen Company, where he was the principal development officer of over 45 major projects. Fred was also instrumental in taking the Alexander Haagen Company public, serving as Chief Investment Officer and Wall Street spokesperson.

In 1998, Fred was one of two principals founding CenterOak Properties, a venture partnership with Oaktree Capital. In 2005, CenterOak Properties became CenterCal Properties, as a new venture was formed to provide additional growth potential for the platform. Fred served as President, Chief Executive Officer, and finally Chairman of CenterCal Properties, and successfully completed several billion dollars of new development transactions.

Having taken a retirement from CenterCal, Fred decided to continue the path of successful development in the Intermountain West. Alongside a group of senior and very talented executives, a new venture was formed with Ball Ventures and Ball Ventures Ahlquist, two companies with very deep roots in the Intermountain West, both very well known for the quality and success of their commercial developments.

Fred is married to Brandace, the love of his life, and offices in Palos Verdes Estates, California. His hobbies include archaeology, history and flying his antique Stearman biplane. Fred is a member of the California Bar Association, ICSC and ULI, and has served on several commercial and charitable boards.





# CHRIS C. BYERS
## CO-PRESIDENT & CHIEF REVENUE OFFICER

Chris C. Byers is the Co-President and the Chief Revenue Officer of Elevated Property Company, LLC. In this role, Chris leads the leasing efforts of the portfolio and is responsible for tenant relations. In addition, with her two other founding partners, she is involved in all aspects of the company, with an emphasis on acquisitions, and development. Prior to founding Elevated, Chris was at CenterCal Properties, LLC for 13 years where she led the leasing efforts of the entire portfolio as its Senior Vice President of Leasing. In this role Chris played a critical role in leasing the portfolio to over 95% leased, and was involved in the development of 6 new, ground up mixed-use projects from inception to opening by creating the initial merchandising plans through lease up. These developments quickly have become the premier destinations in their respective markets and have changed the way each market trades.

Before joining CenterCal Properties, LLC, Chris spent most of her career on the retailer side of the business representing national retailers and creating growth strategies for many of the top retailers in the United States. She has been in the industry for over 30 years and brings an interesting viewpoint to the creation of the projects in the portfolio. Chris has worked for notable companies such as Chico's, Coldwater Creek, JP Realty and more. Chris is a Utah native and attended the University of Utah.

Chris has been a member of ICSC for over 30 years and lives in Salt Lake City with her husband, Mark Norseth. She is a proud mother to two great children, Jake and Lexie, and bonus stepson, Travis. Chris spends her free time doing yoga, playing golf, and loves to travel with her family.





ELEVATED
PROPERTY CO.

# SEAN DENNISON
## CO-PRESIDENT / CHIEF OPERATING OFFICER

Sean Dennison is the Co-President and the Chief Operating Officer of Elevated Property Company, LLC. In this role, he handles the daily business and legal functions of the organization and, along with his two other founding partners, the executive functions related to the projects of the organization, which include acquisition, leasing, development and financing. Immediately prior to founding Elevated, Sean was at CenterCal Properties, LLC for almost a decade as its Senior Vice President and General Counsel and was responsible for oversight of the company's legal matters, ranging from the negotiation and documentation of transactions to dispute resolution. Before joining CenterCal Properties, LLC, he served for over five years as Senior Regional Counsel for the Western Region of Federal Realty Investment Trust. Prior to that, Sean held senior roles at Stanbery Development, The Gap, Inc. and The Lerner Corporation. Immediately upon graduation from law school, he was an associate in the real estate group at ShawPittman LLP (now Pillsbury Winthrop ShawPittman).

Sean is a member of the ICSC Law Conference Planning Committee, an elected fellow of the American College of Real Estate Lawyers (ACREL), a magna cum laude graduate of Virginia Commonwealth University and the University of Pennsylvania Law School.

Sean lives in Hermosa Beach with his wife (Conni), son (Billy), daughter (Alex), Labrador (Lucy) and cats (Charlie and Panther)



# THE ENGINEERED STRUCTURES, INC. LEAD



## Joe Jackson

### EXECUTIVE VICE PRESIDENT



Over the past 50 years ESI has earned a reputation for creating a unique customer experience in commercial construction

- $1B In Annual Revenue
- 1K Employees
- 51 Years as an Idaho General Contractor
- $1B Bonding Capacity
- .43 EMR Safety Rating
- 42 States ESI is Licensed (Including NV)



# JOE JACKSON
## EXECUTIVE VICE PRESIDENT

- 30+ Years in construction

- 20 Years at ESI

- Past Idaho AGC President

- Previous chair for IAGC Political Action and Legislative Committees

- Public Works Construction License Board Member & Current Vice Chair



# THE BABCOCK DESIGN TEAM



**Danielle Brown**

Graphic Designer



**Tucker Anderson**

Senior Associate/
Project Manager



**TJ Winger**

Senior Principal



**Darin Bell**

Senior Principal



**Babcock** Design

Since 1984, Babcock Design has offered comprehensive architectural, planning, and interior design services across the United States. Our philosophy emphasizes challenging norms, educating, researching, and growing in all facets of our work. Our extensive portfolio highlights a range of high-quality, sustainable, award-winning designs. We foster a culture built on trust, collaboration, and innovation, supported by an exceptional team that values participation from every member. With more than 45 design professionals in our Salt Lake City and Boise offices, Babcock

Design stands out for its excellence in design, responsible architecture, and budget conscious, sustainable practices, primarily in the public development sector. We collaborate closely with clients to produce outstanding architectural solutions and fulfill their project objectives, adding value to the development team. Every project we undertake is uniquely tailored.

Successful architecture arises from carefully integrating three core elements: the client, the site, and the program. Since these factors vary for each project, our solutions are equally distinct. Our diverse portfolio demonstrates our commitment to realizing each client's vision. We ensure our process emphasizes teamwork and brings innovation to the forefront, transforming client wishes into a design that makes a difference.



**Babcock** Design

# DARIN BELL
## SENIOR PRINCIPAL

Darin Bell was awarded the 2000 Grand National Award by the US Department of State for his design of an "Embassy for the New Millennium." He began his career in Europe, focusing on intricate hospitality projects in Northern Africa and the Middle East. Over time, his emphasis has shifted to master planning and creating architectural elements for large-scale developments. The interplay of various functions on a single site allows for a unique, dynamic solution. He seeks to enhance circulation, connectivity, and identity so that the overall experience is greater than the individual components. As Senior Design Director at Babcock Design, Darin has led multiple projects in the Intermountain West, significantly benefiting numerous municipalities, developments, and organizations through his vision and expertise.



# TJ WINGER
## SENIOR PRINCIPAL

TJ is the person in charge of leading the project, ensuring that the company's resources are well-utilized and that the project is successfully delivered. With over 25 years of experience in the industry, he has gained extensive knowledge of master planning and setting up projects for success. His vast experience has enabled him to listen to clients' goals and objectives and dedicate extra effort in the early stages of the project to create sites and buildings that perform exceptionally well in multiple areas.



**Babcock** Design

# TUCKER ANDERSON
## SENIOR PRINCIPAL / PROJECT MANAGER

Tucker's involvement in multiple facets of the architectural industry has allowed him to serve as an architect, product developer, and construction manager. He possesses extensive experience in leading teams on substantial, intricate projects and is thorough in ensuring that the owner's needs are fulfilled from design through to construction completion. With his expertise, Tucker has significantly contributed to the design and execution of numerous industrial projects. He collaborates directly with stakeholders to set project goals, timelines, and budgets. During the project, Tucker steers the architectural and engineering teams to achieve these objectives and guarantee the project's success.



## Babcock Design

# DANIELLE BROWN
## GRAPHIC DESIGNER

Danielle is an accomplished graphic designer with 35 years of experience in architecture. Over the past 25 years, she has specialized in master plan and feasibility study designs. Her impressive portfolio features her skill in creating engaging and clear graphics that enhance understanding of various elements within a master plan.



# Downtown Reno Revitalization



# EXHIBIT 8

# EXHIBIT 8



May 13, 2023


Brianna Bullentini
GPWM
Reno, NV 89501

**Reference:**  **Letter of Intent – ICRAVE- Experience Visioning and Design Services Associated with the Reno City Center Project.**


Dear Ms. Bullentini:

Please confirm it is the intent of **GPWM Funds** ("GPWM" or "Client"), to use **Journey Corporate Holdings, LLC dba ICRAVE** ("ICRAVE" or "Designer") for Design Services associated with the **Reno City Center Redevelopment Project** (the "**Project**").

It is our desire and intent to work with GPWM to create a world-class destination and experience for the city of Reno. We will provide a conceptual and experiential vision along with interior design and lighting design services to be outlined in a corresponding Proposal. It is also understood that we will perform these services contracted under and working with GPWM's local Architect.

ICRAVE has provided comprehensive design services for numerous large-scale projects such as Sphere in Las Vegas, TSX Entertainment in Times Square, the Dream Hotel at Miami's Riverside Wharf along with numerous award-winning restaurant locations. Please see a tailored portfolio of relevant work attached as Exhibit A.

ICRAVE shall perform services in a manner consistent with the generally accepted standard of care and skill ordinarily exercised by professionals performing similar services under similar circumstances at the place and time the services are being performed. We will exercise reasonable professional care in efforts to comply with codes, regulations, laws, rules, ordinances, and such other requirements in effect as of the date of execution of this Letter of Intent.

Payment for initiation of services is due upon Client's acceptance of the Design Services proposal prepared by ICRAVE. Notwithstanding anything in the foregoing to the contrary, Client shall not be responsible for any reimbursable expenses, costs, or fees of Designer pursuant to this Letter of Intent.

We are quite pleased to be involved and look forward to working with GPWM on the Project. Please acknowledge your review, understanding, and acceptance of the conditions set forth above by returning an executed original of this letter to the undersigned within 30 days of the date noted above.


Sincerely,

Lionel Ohayon
Founder / Chief Creative Officer
Journey Corporate Holdings, LLC dba ICRAVE
1140 Broadway, Floor 1,

Initial: GPWM \_\_\_\_
ICRAVE \_\_\_\_

New York, NY 10001
Date: May 13th, 2024

ICRAVE
Letter of Intent
05/13/24
Page 3 of 2

GPWM has reviewed this LOI and agrees to the terms and evidences such assent to be bound by its signature below:

Name:
Title:
Date:    _____

Attachments:    **Exhibit A –** ICRAVE Portfolio

Las Vegas Sands Corp.,
Letter of Authorization
01/31/23
Page 1 of 5

# EXHIBIT 9

# EXHIBIT 9



*"Creating a community that people are proud to call home."*

5/13/24

Reno City Center Owner LLC
C/O Reno City Center LLC Manager
339 W State St, Suite 201
Eagle, ID 83616

RE: Urgent Appeal to Prevent Foreclosure and Auction of Reno City Center

To Whom It May Concern,

We write to you today on behalf of the City of Reno requesting your attention regarding the impending decision facing the Reno City Center development project. We understand that the property's foreclosure and potential auction are under your jurisdiction, and we respectfully request your trust in the new direction and leadership of the Reno City Center team.

The Reno City Center, in its current state, represents a substantial hindrance to the growth and development of our city. Its dilapidated condition not only detracts from the overall aesthetic appeal of downtown Reno, but also poses significant challenges to our efforts to attract new businesses, residents, and investment to the area. A thriving downtown core is essential for the continued growth and prosperity of Reno. However, the presence of blighted properties like the Reno City Center sends a negative message to potential investors and developers, limiting our ability to fully capitalize on the economic potential of our city.

The Reno City Center stands as a vital piece of our downtown landscape, holding immense potential to contribute to the growth and vitality of our city. We acknowledge the challenges that have plagued this property in the past, leading to its current state of disrepair and financial instability.

The redevelopment of the Reno City Center into a vibrant mixed-use development, as outlined in the new strategic plan, presents a tremendous opportunity to breathe new life into our downtown area. We are encouraged by the recent efforts and strategic vision put forth by the new leadership team tasked with revitalizing the project. This dedicated group brings with them a wealth of experience and expertise in urban redevelopment, along with a clear and locally-focused plan to transform the property into a vibrant hub of activity that will benefit our entire community.

Allowing the Reno City Center to go into foreclosure and auction would not only disrupt the progress and momentum that has been gained under the new leadership but would also risk further delays and setbacks in the property's redevelopment. Such an outcome would not align with our collective vision for a thriving and prosperous downtown Reno. We firmly believe that with the support and cooperation

of all stakeholders involved, including the judiciary, we can overcome the challenges facing the Reno City Center and realize its full potential as a catalyst for economic growth and revitalization in our city. Therefore, we respectfully urge you to consider the broader implications of your decision and to trust in the new direction and leadership of the Reno City Center team. By doing so, we can work together to ensure a brighter future for this important property and for the City of Reno as a whole.

Thank you for your attention to this matter. Should you require any further information or assistance, please do not hesitate to contact me.

Respectfully,

Hillary Schieve
Mayor of the City of Reno



RE: Reno City Center Bankruptcy Reorganization

We at the Downtown Reno Partnership (DRP) are writing to express our strong support for the continuation of the Reno City Center/Harrah's redevelopment project.

Reno City Center occupies a crucial position in our downtown landscape, encompassing two mega blocks totaling 21 parcels and 5.7 acres. Adjacent to our iconic Reno Arch—the most photographed landmark in the region—this property sits in the center of our main street and has regrettably become a blighted backdrop for major events during the last two summer seasons.

The ongoing stagnation in this area poses a substantial threat to downtown Reno's progress, detrimentally impacting surrounding businesses and preventing adjacent development projects from starting. Its dilapidated condition detracts from the aesthetic appeal and undermines our efforts to attract visitors, businesses, new residents, and investment into the heart of our city. As the leaders and custodians of downtown, we witness these challenges daily.

Furthermore, Reno City Center is near the University of Nevada, Reno (UNR), an esteemed institution that significantly contributes to our community's vitality. The blighted state of this property contrasts starkly with UNR's vibrancy and impedes potential synergies between the university and downtown.

We understand the obstacles faced by the previous development group and trust that the court will allow a new developer to promptly continue the project. Allowing Reno City Center to go into foreclosure and auction would create additional delays and further deteriorate the property, hindering revitalization efforts and undermining our collective aspirations for a vibrant downtown Reno.

It is in the best interests of our city for you to permit the opportunity to overcome the challenges faced by Reno City Center and realize its full potential as a catalyst for economic growth and revitalization.

Thank you for your careful consideration. Please do not hesitate to contact us for any additional details.

Respectfully,

Neoma Jardon, Executive Director



May 13, 2024

To Whom it May Concern:

We write to you today as The Simon Family, owner of the neighboring Reno Aces, Park Center Tower and other nearby property, to express our support GPWM and the new leadership team on their efforts to revitalize the Reno City Center.

As the next-door neighbor to the Reno City Center, we have a vested interest in seeing this district thrive and prosper. We recognize the immense potential of this area to become a vibrant and dynamic destination for residents and visitors alike.

By partnering with the new leadership team and leveraging our collective resources and expertise, we believe that we can unlock the full potential of this district and create a vibrant urban center that benefits the entire community.

Allowing the Reno City Center to go into foreclosure and auction would not only disrupt the progress that has been made but also undermine the efforts of those who have worked tirelessly to bring the final vision to fruition. It is imperative that we support and empower these individuals to continue their work and realize the potential of this district.

We are committed to working collaboratively with the new leadership team, the judiciary, and other stakeholders to ensure the success of the Reno City Center redevelopment.


Thank you for your attention to this matter.


Respectfully,


Herbert Simon